[No. S029011. July 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MORRIS SOLOMON, JR., Defendant and Appellant.

COUNSEL

Bruce Eric Cohen, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon, Patrick J. Whalen, Michael P. Farrell and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—A jury convicted defendant Morris Solomon, Jr., of four counts of first degree murder and two counts of second degree murder, and found true a multiple-murder special-circumstance allegation.[1] It also found him guilty of sexually assaulting two other victims. On retrial following jury deadlock at the first penalty trial, a second jury returned a verdict of death.[2] This appeal is automatic. We affirm the judgment.

[1] Penal Code sections 187, subdivision (a), 190.2, subdivision (a)(3). Further statutory references are to the Penal Code, unless otherwise specified.

[2] Defendant also was sentenced to an indeterminate term of 30 years to life for the second degree murders. For the nonfatal sexual assaults, he received a determinate term of 55 years, plus 10 years for having suffered two serious felony priors. (§§ 261, subd. (a)(2), 286, subd. (c), 288a, subd. (c), 12022, subd. (b), 12022.3, subd. (a), 667, subd. (a).)

## I. FACTUAL BACKGROUND

The facts are summarized here for background purposes. Further details and procedural matters are discussed in connection with defendant's specific contentions.

### A. Guilt Phase: Overview of Prosecution's Case[3]

In the 10 months between June 1986 and April 1987, Sacramento police discovered the bodies of seven local prostitutes. All but one were found at homes where defendant had worked or resided. More than half were buried in shallow, backyard graves. Nearly all of the women had been bound, two were gagged, and four were nude or partially clad from the waist down. All were drug users.

After defendant's arrest for the murders, three prostitutes reported to police that defendant had sexually assaulted them. One had been bound and gagged.

Police interviewed defendant multiple times. Both before and after his arrest, defendant made inconsistent and false statements about his presence and activities in the places where the bodies were found. He also falsely denied knowing, or misrepresented the nature of his interactions with, the victims.

#### 1. The six murders[4]

##### a. The first degree murder of Yolanda Johnson

On the morning of June 18, 1986, a 911 call summoned officers to an abandoned duplex on 4th Avenue in the Oak Park section of Sacramento. They discovered the decomposing body of 22-year-old Yolanda Johnson in the closet of the upstairs apartment. There were ligature marks on her neck and wrists, and her body position suggested her wrists had been bound together behind her back. Johnson, a prostitute and drug user, was nude from the waist down and there were semen stains on her thighs. She had sometimes used the abandoned building to engage in prostitution. The day before Johnson's body was found, defendant told several people he was looking for her.

---

[3] The defense presented no evidence at the guilt phase of trial.

[4] The prosecution charged defendant with murdering Angela Polidore, whose body was discovered on July 20, 1986, in the basement of an abandoned house on Sacramento Avenue. Polidore was unclothed from the waist down and her wrists had been bound behind her back with electrical wire. Two athletic socks stuffed inside her mouth had been tied in place with a fabric binding that circled her head. The jury deadlocked on that count, the court declared a mistrial, and the charge was eventually dismissed.

An autopsy showed Johnson had died one to four days earlier. Due to decomposition, the pathologist was unable to determine the exact cause of death. But he opined Johnson could have died from either drug toxicity or strangulation. ABO blood-grouping tests showed defendant could have been the source of the semen stains on Johnson's thighs.

b. *The first degree murder of Maria Apodaca*

On March 19, 1987, workers digging a ditch in the backyard of an abandoned house on 19th Avenue in South Sacramento unearthed the body of 18-year-old Maria Apodaca. The victim was a heroin addict and prostitute who had been missing for several months.

Apodaca was buried at a depth of about three feet, under a piece of plywood covered with dirt. Her clothed body was bound in a fetal position; a cloth belt held her wrists behind her knees. The body was wrapped in a bedsheet enveloped by black plastic.

The body was badly decomposed. The pathologist estimated death had occurred two to eight months earlier. The cause of death could not be determined, but dark discoloration around Apodaca's neck suggested asphyxia from suffocation or from a broad-width ligature.

c. *The second degree murder of Cherie Washington*

On April 20, 1987, one month after the discovery of Apodaca's body, police detectives investigating defendant's possible involvement in that murder visited his former residence on 44th Street in Oak Park. An unusual depression in the backyard yielded the body of 26-year-old Cherie Washington from a shallow grave. She was nude from the waist down, but had not been bound or wrapped in a covering. Washington was a rock cocaine addict who sometimes engaged in prostitution to support her habit. Neighbors recalled seeing her several times standing at the front door of the house where her body was recovered.

Again, advanced decomposition precluded an exact determination of the date or cause of death. The pathologist estimated she died between three and nine months earlier, possibly of positional asphyxia, strangulation with a soft, wide ligature, or cocaine overdose.

d. *The second degree murder of Linda Vitela*

On April 22, 1987, two days after Washington's body was unearthed, the body of 24-year-old Linda Vitela was recovered from a shallow grave in the

backyard of an uninhabited residence on Broadway in Oak Park. Vitela's body was fully clothed and wrapped in a blanket tied with electrical wire in several places. Vitela was a prostitute and a heroin addict.

An autopsy disclosed Vitela had died approximately one year before her body was discovered. Although decomposition precluded a determination of the cause of death, the pathologist could not exclude the possibility of asphyxia or fatal intoxication from drugs or alcohol.

### e. The first degree murder of Sheila Jacox

Also on April 22, 1987, police found the body of 17-year-old Sheila Jacox in a second shallow grave in the Broadway backyard. Jacox's nude body was wrapped in bedding secured by duct tape. Duct tape had also been used to bind her body from the waist down and to hold a balled-up sock inside her mouth. Jacox was a prostitute and narcotics user.

The decomposition of Jacox's body was even more pronounced than that of Vitela's. However, a forensic anthropologist estimated that Jacox had been dead "about a year." Although the pathologist who performed the autopsy reported the cause of Jacox's death as "undetermined," he could not exclude alcohol or drug overdose, or most forms of asphyxia.

### f. The first degree murder of Sharon Massey

On April 28, 1987, police unearthed the body of 29-year-old Sharon Massey from the same 19th Avenue backyard where Maria Apodaca had been exhumed the previous month. Massey's body was encased in a sheet knotted over her left shoulder, then covered with a bedspread. Her thighs, legs, and ankles were bound with a severed electrical cord, and a braided fabric strap held her wrists behind her back. Draped around her neck was a three-foot-long stereo speaker connector. Massey's upper body was fully clothed, but her panties and jeans were on only the right leg, and were pulled down to the thigh. A red sock was compacted into her throat, and a second sock protruded from her mouth. Massey had supplemented her income from a hospital clinic job with prostitution, and she may have been a crack cocaine user.

The pathologist who performed the autopsy of Massey's decomposed, mummified body estimated she had been dead approximately six months. A cause of death could not be determined, but asphyxia was not excluded.

### 2. The nonfatal sexual assaults on other victims

News of defendant's arrest prompted two women to report that defendant had sexually assaulted them. Police later discovered a third sexual assault victim.

Melissa H. was a prostitute with a $300-a-day heroin habit. Although Melissa had once smoked cocaine with defendant in his car, she had repeatedly rebuffed his attempts to "date" her, telling him she did not date Black men. In early June 1986, several weeks before the discovery of Johnson's body, defendant grabbed Melissa by the neck as she entered the back door of the vacant apartment where she often brought clients. At knifepoint, defendant directed Melissa to disrobe and get on the bed. He hit her in the face with his fist and a table leg, and forced her to orally copulate him. After binding Melissa's wrists behind her back with a piece of leather, defendant sodomized, orally copulated, and raped her. At one point, defendant placed a sock in Melissa's mouth, which muffled her screams. Then, to prevent her from getting up, he tied her feet to the foot of the bed with an electrical cord that ran up her body and encircled her neck. About five hours later, defendant fled through the back door when Melissa's boyfriend/pimp started knocking on the doors and windows, yelling for her to open up. Melissa's boyfriend found Melissa wrapped in a quilt, bound, gagged and bleeding from her nose, mouth, and vaginal area.

Sherry H. supported her cocaine addiction with prostitution. One morning in October 1986, she agreed to "date" defendant for $50 and got into his car. After arriving at a house on 19th Avenue, Sherry started to remove her sweater. As she did so, defendant approached her from behind and tried to strangle her with a shoestring. Sherry frustrated the attempt by slipping her fingers between the shoelace and her neck and then falling to the ground. After an act of intercourse, she convinced defendant to take her home. Sherry suffered welts on her neck and internal hemorrhaging in one eye.[5]

### 3. Defendant's presence in the locations where the bodies were found

Defendant either lived in or worked at each of the locations where the murder victims were discovered.

In November 1985, defendant was hired to remodel a fire-damaged house on Broadway. He lived there until June 18, 1986, when he was evicted for failing to pay rent. The bodies of Linda Vitela and Sheila Jacox were unearthed from the backyard in April 1987. Vitela was last seen alive in February 1986. Jacox had been missing since March 20, 1986. After the bodies were discovered, defendant's next-door neighbor told police she saw

---

[5] According to Latonya C., a "pimp" for three prostitutes, she was inside defendant's 44th Street residence on February 2, 1987, when he began strangling her with a black shoestring wrapped around each hand. The arrival of two girls interrupted the attack and she was able to flee. The jury deadlocked on charges defendant sexually assaulted and attempted to murder Latonya, and those counts were eventually dismissed.

defendant dig in five places in the backyard. Defendant had told her he was working on a sewer line and planting a garden.

In April 1986, while still living on Broadway, defendant was performing "end work" in the restoration of an abandoned duplex on 4th Avenue. Starting sometime in May, defendant was the sole worker there, and the only person with keys. The second and third floors of the building were separately locked, but the basement was unsecured and frequently inhabited by transients, drug users, and prostitutes. On June 17, 1986, the building's owner arranged to meet defendant at the site the following morning to discuss the status of the project. However, on June 18, defendant arrived early at the duplex, unlocked the front door and entered, and then came outside shouting he had found a corpse inside. Responding officers found the body of Yolanda Johnson in a closet in the upstairs apartment. She had been missing for three days.

In August 1986, shortly after defendant's eviction from the Broadway residence, he rented the master bedroom in a house on 19th Avenue. He lived there until October 23, 1986, when he and the other residents were evicted for failure to pay rent. The bodies of Maria Apodaca and Sharon Massey were unearthed from the backyard on March 19, 1987, and April 28, 1987, respectively. Apodaca was alive as of September 8, 1986, when she was released from custody following a prostitution arrest. Sharon Massey was last heard from on September 14, 1986.

After leaving the 19th Avenue residence, defendant spent several months living out of his car near a jobsite. Then, on December 15, 1986, he and a friend moved into a vacant house on 44th Street. Defendant's mother lived across the street. At the end of February 1987, defendant and his housemates were evicted. On April 20, 1987, the body of Cherie Washington was found buried in the backyard. She was last seen alive on February 6, 1987.

### 4. The investigation

#### a. Defendant's prearrest statements

Defendant was questioned by police immediately after the discovery of Yolanda Johnson's body on June 18, 1986. He falsely identified himself as Ernest Carl Padilla,[6] and said he was last inside the building two days earlier, on Monday, June 16, 1986. Defendant also told police he did not recognize the victim. But when asked by a television news reporter at the scene if the victim was a prostitute, as bystanders had suggested, defendant said, "It wouldn't be right . . . to call her a working girl."

---

[6] Carl Padilla is defendant's brother.

Defendant spoke with police twice more that same day. In the afternoon, defendant corrected himself, saying he had last been inside the duplex on the previous Monday, June 9, 1986, not June 16. Later that evening, defendant provided his true name. He explained he initially had identified himself as his brother because of several outstanding warrants. Defendant then agreed to talk with the officers at the police station.

Investigators conducted a taped interview that night. When shown a photograph of Yolanda Johnson, defendant said he knew her as "Yo Yo," and had once "dated" her in a camper parked in front of his Broadway home. He also indicated she once stole $20 from him. Defendant stated he and Johnson had never been in the 4th Avenue duplex together, and he had no idea how she ended up inside the closet. However, Johnson's mother reported that Johnson told her she had "dated" defendant in the houses he was renovating. Over the next few days, defendant provided fingerprints and a blood sample, and had several brief telephone conversations with police. No arrest was made.

Defendant was interviewed again on March 20, 1987. The previous day, the body of Maria Apodaca was unearthed from the backyard of defendant's former residence on 19th Avenue. When asked where he had lived in the past, defendant omitted the 19th Avenue house from his list. He admitted having stayed there only when asked about it directly. Defendant also falsely claimed that he had moved away from that location in September 1986.

Again, defendant was not arrested.

One month later, in the early afternoon of April 20, 1987, Detective Pane came to defendant's jobsite to reinterview him. Defendant said he knew Johnson but had never seen Apodaca before. During the conversation, defendant consented to a search of a Ford Maverick that he had abandoned in front of his former residence on 44th Street. Several hours later, while officers searched the car, they noticed an indentation in the backyard. At that spot, the body of Cherie Washington was exhumed from a shallow grave. Detective Pane came to defendant's home in the evening and confronted him with the latest discovery. Defendant claimed he had never done any digging in the backyard of that house, and insisted he had not killed anyone.

b. *Defendant's postarrest statements*

Defendant was finally arrested on April 22, 1987, the same day the long-buried bodies of Linda Vitela and Sheila Jacox were found in the backyard on Broadway. During a lengthy custodial interrogation, defendant continued to maintain his innocence.

Defendant said that Yolanda Johnson frequently visited the Broadway house when he lived there with a small group of prostitutes. She stole an expensive ring from him, but he denied being angry about it. However, police learned that defendant had once remarked to an acquaintance as Johnson walked past them that he was "going to kill that bitch" for her role in the theft of his stereo equipment. And when asked to explain the presence of his palm print on the closet door where Johnson's body was found, defendant contradicted his earlier account about the scope of his work in that room.

Defendant repeated his earlier claim that he did not know Maria Apodaca. But defendant's Broadway housemates reported Apodaca had visited defendant there several times. Defendant also adamantly denied the reports of his friends and former housemates that the sheet encasing Apodaca's body came from defendant's bed. When told his 19th Avenue housemates had also said he did some digging in the backyard near the location of Apodaca's shallow grave, defendant claimed he did no repair work or landscaping at that residence.

Defendant maintained he had never seen Cherie Washington. But one of his 44th Street neighbors said defendant introduced Washington to her while the three of them stood in defendant's living room. After the introductions, Washington followed defendant into his bedroom. Defendant also told Detective Pane in a prearrest interview that he did not dig in the backyard there. After his arrest, he indicated he once dug in the backyard while replacing 50 feet of sewer line.

As for his activities in the backyard of the 19th Avenue residence, defendant first told Detective Pane he did some digging when he replaced posts on the back porch. But he immediately changed course, saying he did no digging whatsoever.

### 5. Defendant's interactions with local prostitutes

Evidence at trial showed defendant was a well-known figure in Oak Park. He enjoyed the company of prostitutes both socially and sexually. Defendant told Detective Pane that prostitutes were "more real [than the] average person." Some of Oak Park's prostitutes considered defendant a gentle and caring friend who gave them money and a safe place to stay when they needed it. However, defendant could be rough and intemperate with the prostitutes he "dated," even with those who considered him a friend. And he characterized women generally, and prostitutes specifically, as "bitches, whores and tramps." Around the time of the earliest murders, defendant had a short-lived love affair with a prostitute named Rosella Fuller, who moved into

the house on Broadway, with a $200-a-day crack cocaine habit. The relationship led defendant into a costly drug habit of his own that ruined him financially.

### B. *Penalty Phase*

#### 1. *Prosecution evidence*

##### a. *Circumstances of the crimes*

The jury that decided defendant's guilt deadlocked on penalty, and the court impaneled a new jury for retrial of the penalty phase. To show the circumstances of the crimes, the prosecution presented its case-in-chief a second time. With minor departures, the evidence was substantially the same as that presented before.

##### b. *Evidence of defendant's other violent crimes and prior convictions*

The prosecution presented evidence of violent crimes defendant committed a decade or more before the capital offenses. All of the incidents involved sexual assaults of young women, and some of the facts were strikingly similar to evidence in the capital case.

###### i. *Aggravated assault on Mary K.*

Mary K. testified that on September 19, 1969, she was 18 and working as a street prostitute in Oakland. Around 10:00 p.m., she got into defendant's car to negotiate for sexual services. Defendant drove to a darkened residential street, paid Mary $10, and orally copulated her. He then demanded his money back. When Mary refused, defendant held a curved knife to her throat. Mary agreed to give the money back, but then started screaming. As she swung her left leg out of the car, defendant cut her right thigh with the knife. The injury required 23 stitches.

###### ii. *Abduction, sexual assault, and robbery of Virginia J.*

Virginia J. testified that in January 1971, she was in her early 20's and living in a motel in Oakland. On January 12, as she walked along MacArthur Boulevard looking for a place to eat, defendant grabbed her from behind, threatened to shoot her, and forced her into his car. Defendant had propositioned her once before, but she had told him she was not a prostitute.

Defendant drove Virginia to an isolated area in the Oakland hills to sexually assault her. En route, Virginia complied with defendant's demand to remove her clothing. After parking the car, defendant ordered her to orally copulate him, and to lick his anus, testicles, and scrotum, which she did. Defendant unsuccessfully attempted to sodomize her, then raped her. Afterwards, he inserted his fingers into her vagina, put his fingers into her mouth and ordered her to swallow. When she refused, he punched and pulled at her nipples. He then kicked her out of the car and drove off with her jewelry and clothes.

### iii. *Abduction and assault on Dale W.*

In May 1971, Dale W. was a student at Alameda Junior College. On May 17, she studied on campus at the University of California, Berkeley, until the library closed at 10:00 p.m. As she walked down Telegraph Avenue hoping to hitch a ride home to downtown Oakland, defendant pulled up and offered her a lift. She got into the car, but defendant drove to the freeway and headed in the opposite direction. He told Dale he wanted to have sex with her and would not harm her if she cooperated. He then grabbed her hair and held her head back over the seat so she could not see where they were going.

Defendant pulled off onto a dirt road. While Dale fought and clawed at him, she managed to pull the key out of the ignition and throw it out the window. She fled from the moving car, but defendant gave chase and overtook her. He knocked her to the ground and kicked her face, then ran back to the car to stop it from rolling away. Defendant was later convicted of assault to commit rape. (§ 220.)

### iv. *False imprisonment of and sexual assault on Connie S.*

Connie S. testified that on October 18, 1975, she did a "guest spot" performance as a topless dancer in a San Jose club. Around midnight, defendant agreed to pay her for sex and they went to defendant's trailer across the street. Defendant paid Connie $25 and they had intercourse. As Connie was dressing to leave, defendant came up from behind and pulled a chain around her neck, saying, "Are you ready to die bitch?" She lost consciousness. When Connie came to, defendant urinated on her face. He then wrapped her hands together with tape, positioned her knees between her arms, and bound her ankles. Defendant hoisted Connie onto the bed and forced her to orally copulate him. He then left in her car. When defendant returned 30 minutes later, he removed Connie's bindings and raped her four or five times over the course of the night.

Before defendant left in the morning, he taped Connie's legs to a chair and wired her hands together behind her back. He then brought his Doberman

pinscher into the room and warned Connie that if she moved, the dog would attack her. The dog remained seated as Connie managed to free her hands and ankles, however, and she fled to the trailer next door to call police. Two years later, defendant was convicted of aggravated assault and false imprisonment. (§§ 245, subd. (a), 236.)

### v. *Assault on Darlene G.*

In December 1976, 18-year-old Darlene G. was living with her mother in Sacramento. She testified that around 8:00 p.m. on December 6, she left her home and walked down Stockton Boulevard. Defendant came up from behind, choked her into unconsciousness, and dragged her into a car. He then hauled her into a house located a short distance away.[7]

When Darlene regained consciousness, she was nude from the waist down. Defendant placed her in a closet, where he bound her hands together behind her back and tied them to her feet using rope and shoelaces. He then hit her with a fan belt and whipped her in the face with his penis, threatening to ejaculate on her. Darlene spent the entire night in the closet while defendant slept in the adjoining room. In the morning, she heard a woman knock on the bedroom door and tell "Junior" to get up for work. Before leaving the house, defendant secured Darlene's bindings and said he would kill her if she removed them. Darlene nevertheless managed to untie her feet and made her way to the gas stove to burn off the bindings on her wrists. Defendant returned to the house just as Darlene finished dressing. She escaped by brandishing a knife and ran the two blocks to her mother's home. Four months later, defendant was convicted of assault with intent to rape and false imprisonment. (§§ 220, 236.)

### vi. *Grand theft*

In 1984, defendant was convicted of three counts of grand theft in Arizona.

### 2. *Defense evidence*

The defense presented an extensive case in mitigation. Eighteen witnesses testified over the course of seven days. The defense case largely attempted to show that defendant's crimes stemmed from psychopathology born of the relentless humiliation, abuse, and violence he experienced during his formative years, compounded by his tour of duty in Vietnam and fueled by cocaine use.

---

[7] The house was on 44th Street. The parties stipulated that defendant lived at the house and that it was neither his mother's home nor the house he lived in 10 years later.

### a. *Defendant's early childhood*

Relatives and friends described defendant's upbringing in rural Georgia as frightful and abusive. In 1945, when defendant was an infant, his parents moved in with defendant's grandmother Bertha and other family members. Bertha and the adults in the house constantly fought with one another, both verbally and physically. At one point, defendant's parents moved away, leaving him and his older brother behind. Bertha beat the children daily for infractions such as wetting themselves, mispronouncing words, or crying during a beating. Sometimes, she hit them for no apparent reason. When defendant was very young, Bertha beat him by laying him over her lap and hitting him repeatedly. When he got older, Bertha punished him the same way she did the other children in the household: She made defendant remove all his clothing and stand on a stool in the corner, where she beat his bare body, including his genitalia, with an electrical cord or switches she made him bring to her. Bertha sometimes beat defendant until he bled. Once, she tied his hands around the pole of a bed with an extension cord to keep him from backing away from her during a beating.

Defendant had little contact with his parents for the first 13 years of his life. He was reunited with them when Bertha and the family moved to Isleton, a small farming town 40 miles from Sacramento. They were among a handful of Black families living in a poor, rundown section of the town known as "Cannery Row" or "Tinpan Alley." Defendant's parents frequently beat and sexually assaulted one another in front of him. His mother and grandmother often beat him and verbally abused him in public.

### b. *Adolescence and young adulthood*

The defense called a number of witnesses who knew defendant during his high school years in Isleton. They described defendant as an outgoing, gentle, normal person. Although he could be "pesty" and sometimes behaved inappropriately towards girls, he was never violent or aggressive. If defendant's feelings were hurt, he would keep it all inside. Defendant was an average student, played in the marching band, and competed in track. He invited no one to his home and never spoke about his parents. But defendant's friends knew that his mother and grandmother were hard on him. They considered defendant's mother a "loose woman," who regularly "entertained" different men.

Witnesses who knew defendant after high school likewise described him as kind and outgoing. He attended community college and worked hard at various jobs, including carpentry, car repair, and bus driving. Defendant was generous with his money, and showed women affection by buying them presents.

### c. *Vietnam and its aftermath*

Defendant served in Vietnam for one year starting in the summer of 1966. Defendant's platoon sergeant, Carrol Crouse, testified that he and defendant ran convoys to and from fire bases between their camp and the Cambodian border. Riding in the convoys was stressful because they were likely to encounter mines and small arms fire at any time. He considered defendant an outstanding and trustworthy soldier who saved Crouse's life during a mortar attack. Fellow infantryman Gary Harris served in the same division with defendant. Once, defendant risked his life to rescue four injured soldiers whose tank had hit a landmine. Both witnesses testified that Vietnamese prostitutes were cheap and plentiful, even on the front lines, and that defendant used their services. Shad Meshad, an expert on Vietnam veterans, explained that American military personnel viewed the prostitutes the same way they saw Vietnamese generally, as subhuman.

Defendant returned to Isleton after his tour of duty ended in the summer of 1967. He was a changed person, distant, untruthful, and ill tempered. If defendant heard a loud noise, he would duck. Around this time, defendant became engaged to a woman he had known before going to Vietnam. When she broke off the engagement, defendant was hurt and moved away. He relocated to the San Francisco Bay Area, married someone else, and fathered a daughter. Defendant divorced and eventually moved back to Sacramento.

In April 1977, defendant was convicted of sexually assaulting Darlene G. While at San Quentin State Prison, he was lead inmate in the furniture factory and drove a forklift in the detergent plant. The plant supervisor testified that defendant was rated "excellent" and "exceptional" in attitude, work habits, and perseverance.

### d. *Expert testimony*

Three defense experts explained how defendant's upbringing, Vietnam experience, and drug use created the psychopathology that drove him to commit the crimes.

Clinical forensic psychologist Brad Fisher, Ph.D., testified that defendant's childhood abuse led to the extreme mental, emotional, and behavioral problems that were strongly linked to his crimes. Even though defendant knew killing was wrong and did not hurt all of the prostitutes he encountered, he did not have full control over his behavior. Defendant suffered from a complex mental disorder involving his relationship with women, which was triggered in certain situations, like when he was made to feel humiliated.

Clinical psychologist John P. Wilson, Ph.D., testified as an expert on stress and trauma. Like Dr. Fisher, Dr. Wilson said defendant was driven to commit

the crimes by the psychopathology born of his traumatic, abusive childhood. The chaotic, dysfunctional, and brutal environment traumatized him during his formative years. The abuse made defendant feel worthless and angry with the people who abused him. But defendant denied and repressed his experiences and disassociated himself from the situation.

Dr. Wilson observed that defendant compensated for feeling rejected by being the "good guy" during high school and college. But his Vietnam experience reinforced a pattern experienced in childhood. Trauma and extraordinary stressors occurred daily in a setting where aggression and violence were sanctioned. Furthermore, defendant engaged in deviant sexual contact with Vietnamese prostitutes, who were dehumanized by American military personnel.

As Dr. Wilson explained, defendant tried to do what he believed was expected of him when he first returned from Vietnam. He held down a job, married, and began to raise a family. But he was a different person after his tour of duty. Although he did not meet the diagnostic criteria for posttraumatic stress disorder, he exhibited many of the symptoms, including anger, irritability, and fiscal irresponsibility. Had the military known in 1967 what it knew about psychopathology at the time of trial, Dr. Wilson opined, defendant would have received the kind of treatment he needed. Instead, defendant quit his job, became involved with prostitutes and began selling drugs.

According to Dr. Wilson, beginning with the sexual assaults in 1969 and 1971, defendant could no longer control the psychopathology he previously had managed to keep in check. Dr. Wilson noted a common pattern to the assaults, which he characterized as the reenactment of the humiliation, abuse, and sexual sadism defendant experienced in his formative years. Defendant's acts of violence against his victims paralleled what had happened to him as a boy. In defendant's mind, his victims were replacements for Bertha, who had acted out her rage by humiliating, torturing, and beating him into submission.

The pattern of reenactment escalated in 1986, when defendant's use of cocaine further fueled his psychopathology. In Dr. Wilson's view, defendant harbored a murderous rage. Cocaine use increases paranoia, and diminishes inhibitions and control. Thus, defendant's rage was intensified and he was more likely to act out in a pathological way.

Leon Marder, M.D., an expert in addiction medicine, also testified about the effects of cocaine. An individual's life experiences are important indicators of how cocaine will affect him or her. Use of cocaine by mentally disturbed or unstable persons will worsen their condition. A person with violent tendencies will be unable to control them while under the influence of

cocaine. Moreover, once the proclivity for violence is elevated, it can remain active long after the drug itself has left the body. Prior use of cocaine causes hypersensitivity of the nervous system so that violence can be triggered by stress, anxiety, frustration, and anger.

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Sufficiency of the evidence of premeditation and deliberation*

The prosecution charged defendant with seven counts of murder. The jury found defendant guilty of six murders, four of them in the first degree. Defendant contends there is insufficient evidence of premeditation and deliberation supporting the first degree murder convictions.[8] To the contrary, the record in this case contains substantial evidence from which a rational jury could find premeditation and deliberation beyond a reasonable doubt.

Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. "[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101].) " 'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded

---

[8] Defendant contends that the prosecution's failure to meet its burden of proving premeditation and deliberation violated his state and federal constitutional rights to due process, jury trial, and a reliable capital verdict. He invokes the same constitutional provisions in nearly every other claim raised on appeal. "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].) "No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7 [80 Cal.Rptr.3d 630, 188 P.3d 580]; see *People v. Boyer, supra*, at p. 441, fn. 17.)

otherwise. [Citation.]' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419 [64 Cal.Rptr.3d 721, 165 P.3d 512].)

■ The prosecutor's sole theory of first degree murder as to all seven murder counts was willful, deliberate and premeditated murder. (§ 189.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].) " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 849 [111 Cal.Rptr.2d 129, 29 P.3d 209]; see *People v. Harris* (2008) 43 Cal.4th 1269, 1286–1287 [78 Cal.Rptr.3d 295, 185 P.3d 727].)

■ *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] (*Anderson*) discusses three types of evidence commonly shown in cases of premeditated murder: planning activity, preexisting motive, and manner of killing. (*Id.* at pp. 26–27.) Drawing on these three categories of evidence, *Anderson* provided one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. In so doing, *Anderson*'s goal "was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) But, as we have often observed, "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." (*People v. Perez, supra*, at p. 1125; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1019 [81 Cal.Rptr.3d 299, 189 P.3d 300]; *People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

Defendant claims that upholding the first degree murder verdicts under current precedent violates due process and Eighth Amendment principles. In support, he presents one commentator's view that this court's frequent reliance on the "great rapidity" with which thoughts may ripen into a premeditated and deliberated intent to kill, coupled with our recent "manipulation" of the *Anderson* factors, have collapsed any meaningful distinction between first and second degree murder. (Mounts, *Premeditation and Deliberation in California: Returning to a Distinction Without a Difference* (2002) 36 U.S.F. L.Rev. 261, 327–328.) This argument completely misses the mark. Defendant overlooks a core principle that has guided appellate courts

in assessing the sufficiency of the evidence of premeditation and deliberation for over 60 years: "The true test is not the duration of time as much as it is the extent of the reflection." (*People v. Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; see *People v. Koontz, supra*, 27 Cal.4th at p. 1080; *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) We have observed that "[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." (*People v. Thomas, supra*, at p. 900.) Contrary to defendant's suggestion, a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse. (*Ibid.*)

Defendant's argument also overstates the role of the *Anderson* factors. As we have explained, *Anderson* "did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Thomas, supra*, 2 Cal.4th at p. 517; see also *People v. Perez, supra*, 2 Cal.4th at p. 1125 [*Anderson* factors are not an exhaustive list of evidence that could support a finding of premeditation and deliberation; the reviewing court need not accord them any particular weight].) There is no infirmity, constitutional or otherwise, in the principles guiding our sufficiency review of the evidence supporting a finding of premeditation and deliberation.

■ Despite his criticism, defendant invokes the *Anderson* factors nonetheless, focusing on the evidence relating to each of the four first degree murder victims individually. But the inferences of premeditation and deliberation in this case are reinforced by evidence of the shared characteristics of the six murder victims, the common circumstances preceding and causing their deaths, and the sheer number of murders. We discuss this evidence before addressing defendant's separate challenges to each of the first degree murder convictions. (See *People v. Diaz* (1992) 3 Cal.4th 495, 529–538 [11 Cal.Rptr.2d 353, 834 P.2d 1171] [assessing evidence common to all 12 murder victims in a case involving numerous deaths occurring under similar, unusual circumstances].)

> a. *Evidence of premeditation and deliberation common to all victims*

All six of the murder victims and both of the sexual assault victims were street prostitutes. Defendant referred to prostitutes as "bitches, whores and tramps." He said he treated them "like that because that's the way they wanted to be treated" and "that's why they're out there. . . . They liked that and they enjoy it." Indeed, defendant once related with amusement a time he "fucked the bitch so far in the ass that she shit on herself." That every one of defendant's victims was a prostitute, coupled with defendant's expressions of enmity towards prostitutes generally, strongly suggests defendant entertained

a motive to sexually brutalize and then kill them. (*People v. Prince* (2007) 40 Cal.4th 1179, 1253 [57 Cal.Rptr.3d 543, 156 P.3d 1015] [jury could infer defendant harbored animus against young White women from evidence of other crimes against similar victims]; *People v. Steele, supra,* 27 Cal.4th at p. 1250 [strong inference of motive from defendant's statement to police he hated women and evidence he previously killed a young woman similar in appearance to the victim].) The evidence showed that defendant had thought about this kind of violence outside the immediate circumstances of his crimes and conveyed his views to others.

All four of the first degree murder victims were bound at the wrists and three were also bound at the ankles.[9] The jury reasonably could infer defendant had bound the murder victims before killing them, rather than afterwards, from the evidence of defendant's sexual assaults against Melissa H.[10] Melissa testified that defendant bound her wrists behind her and then forcibly sodomized, orally copulated, and raped her. After the sexual assaults, when Melissa tried to get up, defendant disabled her by tying her ankles to the foot of the bed with an electrical cord that ran up her body and encircled her neck. If Melissa moved her legs, the cord around her neck tightened. Defendant kept Melissa bound in this manner for five hours, until her pimp arrived unexpectedly and defendant fled the scene. Having inferred from this evidence that defendant bound his victims before killing them, the jury reasonably could infer that defendant had ample time to reflect upon and plan their deaths.[11] (*People v. Proctor* (1992) 4 Cal.4th 499, 529 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [after binding the victim, defendant had a significant period in which to contemplate and plan her eventual death].) Defendant asserts that the binding evidence showed he acted impulsively and spontaneously, rather than pursuant to a preconceived plan, because the materials he used were close at hand and traceable to him. In *People v. Rowland* (1982) 134 Cal.App.3d 1 [184 Cal.Rptr. 346], the appellate court concluded there was insufficient evidence to support the element of premeditation and deliberation when the evidence showed the defendant strangled the victim with an electrical cord he found in the bedroom where the murder occurred. (*Id.* at p. 8.) In the *Rowland* court's view, the evidence in that case did not suggest the defendant had taken " 'thoughtful measures' to procure a weapon for use against the victim."

---

[9] Johnson was not bound at the time her body was discovered, but it could be inferred from evidence of ligature marks and the position of her body that she had been.

[10] Contrary to defendant's assertion, the prosecutor did not "concede" during oral argument that the bodies could have been bound after death to make it easier for defendant to carry them to the backyard for burial. The record shows the prosecutor prefaced that remark with the observation that "[t]here's no point tying somebody up after they're dead." In any event, "[i]t is axiomatic that statements by counsel are not evidence . . . ." (*People v. Richardson* (2008) 43 Cal.4th 959, 1004 [77 Cal.Rptr.3d 163, 183 P.3d 1146].)

[11] Neither Vitela nor Washington was bound. Notably, the jury set their murders at second degree.

(*Ibid.*) Here, by contrast, it reasonably can be inferred from the evidence that defendant bound his victims in order to disable them and then contemplated and planned their deaths. That defendant tied his victims with materials that were close at hand does not preclude the inference that he thereafter considered a course of action to kill them.

 Because the victims' bodies were badly decomposed when discovered, pathologists could not determine the precise causes of death. The experts found, however, that asphyxiation was a possible cause of death in every case. Their testimony, coupled with evidence that defendant used ligatures and a gag during his sexual assaults on the two surviving victims, strongly supports an inference that defendant asphyxiated each murder victim. From this manner of killing, the jury reasonably could infer that defendant had time to consider the murderous nature of his actions. (*People v. Bonillas* (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844] ["Ligature strangulation is in its nature a deliberate act."].) Defendant finds it "hard to see how a juror could have made a constitutionally supportable decision as to how the death[s] occurred" when the pathologists who examined the victims were unable to do so. We agree that the manner-of-killing evidence presented at trial was not definitive. We note, too, that neither expert testified about the length of time it took to render the victims unconscious. Viewed in light of the entire record, however, the pathologists' testimony provided a "reasonable foundation" for an inference of premeditation and deliberation. (*People v. Anderson, supra,* 70 Cal.2d at p. 25.) " '[W]hat the pathologist can say from a laboratory examination is more limited than what a reasonable trier of fact may find beyond any reasonable doubt, after considering the evidence as a whole.' [Citation.]" (*People v. Thomas, supra,* 2 Cal.4th at p. 515.)

 Finally, the sheer number of killings, apparently carried out in the same manner, gives rise to an inescapable inference that most of them were preconceived and deliberate. As we previously have explained, "the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated. [Citations.]" (*People v. Steele, supra,* 27 Cal.4th at p. 1244; see *People v. Rogers* (2006) 39 Cal.4th 826, 853 [48 Cal.Rptr.3d 1, 141 P.3d 135].) Here, the evidence showed defendant killed six prostitutes. Four of them were bound, most were nude from the waist down, and all may have been asphyxiated. A reasonable jury could infer that, as to Jacox, Johnson, Apodaca, and Massey, who were the second, third, fourth, and fifth victims, defendant had engaged in a preconceived, deliberate plan to sexually brutalize and kill street prostitutes. (See *People v. Prince, supra,* 40 Cal.4th at p. 1253 [evidence of five similar murders supported the inference that defendant went to sixth

victim's home with a preconceived plan to kill]; *People v. Steele, supra*, at pp. 1245, 1250 [inference of premeditation and deliberation from evidence of planning, motive, and manner of killing was strengthened by evidence that the defendant previously committed a similar crime].) Defendant acknowledges the possibility that his memory of murdering Vitela, the first victim, was part of the careful thought process required for a showing he deliberated the subsequent murders. But he suggests it is "just as likely" he did *not* engage in a careful weighing of considerations and that his victims said or did something to provoke a mindless and overpowering rage. He also points out that his sexual assault on one of the surviving victims, Sherry H., took place after six of the seven murders had been committed. According to defendant, this evidence shows he was capable of subsequent impulsive, unpremeditated violence notwithstanding having killed before. Defendant's arguments fail because they misapprehend our role in assessing the sufficiency of the evidence supporting the verdicts. " '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 [40 Cal.Rptr.3d 118, 129 P.3d 321].)

> b. *Evidence of premeditation and deliberation pertaining to each of the first degree murder victims*

In addition to the characteristics common to all the crimes, ample evidence of each crime supports the jury's findings.

> i. *Murder of Sheila Jacox*

Defendant asserts he had no prior relationship with Sheila Jacox from which a motive to kill could be inferred. (*People v. Koontz, supra*, 27 Cal.4th at p. 1081.) Of course, motive is not an element of the crime (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754]), and a motive to kill a class of people would be probative even if the selected victim is a stranger (*People v. Prince, supra*, 40 Cal.4th at p. 1253). Further, several witnesses testified Jacox was introduced to defendant at the Broadway residence. And regardless of how well defendant knew Jacox, there was evidence from which the jury reasonably could infer he knew she was a prostitute. According to one witness, Jacox occasionally solicited "dates" on Broadway, close to defendant's residence.

As for planning, the evidence that defendant bound Jacox strongly supports the inference of a premeditated plan to kill her. As previously discussed, from the evidence that defendant bound and then sexually assaulted the surviving victim Melissa H., it could be inferred he bound Jacox before, not after,

killing her. Notably, the evidence showed that the binding was both secure and elaborate. Jacox was bound with duct tape at the ankles, thighs, legs, and trunk. Duct tape extending from Jacox's face to the back of her head held a balled-up sock inside her mouth. From this evidence, and taking into account defendant had also bound three other murder victims, the jury could infer that, once having completely disabled Jacox, defendant reflected upon and planned her death. Defendant posits that the bedsheet, duct tape, and sock found with Jacox's body were commonplace items that could have been used in the moment to violently conclude a bargain for sexual services. His argument in essence asks us to reweigh the evidence, which is a task we do not perform when assessing the sufficiency of the evidence on appeal. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].)

Expert testimony that Jacox could have died from asphyxia, together with evidence that five other victims may have been killed under similar circumstances, supports a conclusion that the murder was deliberate rather than impulsive. Defendant points out that no potential ligature was found with the body, nor was there any evidence of strangulation. Furthermore, he contends, no clear evidence showed the sock found in Jacox's mouth would have prevented breathing. Again, these arguments call on us to improperly reweigh the evidence.

### ii. *Murder of Yolanda Johnson*

The evidence showed additional premeditation in Yolanda Johnson's killing. She was a frequent visitor at defendant's home and stole from him. Defendant told Detective Pane during a pretrial interview that Johnson took an expensive ring. Although he claimed the theft did not bother him, trial testimony suggested otherwise. Defendant's acquaintance, Vernell Dodson, testified that sometime in March 1986, several months before the murder, Johnson walked past him and defendant as they sat on the porch of the Broadway house. As she passed by, defendant remarked, "I'm going to kill that bitch," and told Dodson that Johnson instigated the theft of his stereo equipment. Pamela Suggs, one of the prostitutes who lived with defendant at the house, testified that on the day before Johnson's body was found, defendant was out looking for her. Suggs initially told Detective Pane that defendant also said he was "going to kick her fucking ass."

Defendant acknowledges the quoted testimony. But he argues that Dodson's testimony was not "reasonable, credible, and of solid value," and thus could not be relied upon by a reasonable trier of fact, because it was "thoroughly discredited." He notes that Dodson did not contact police about defendant's statement until one year after Johnson's death, while he was in prison on a

parole violation. Defendant's argument is misplaced. It is the task of the jury, not the reviewing court, to determine the credibility of witnesses. (*People v. Guerra, supra,* 37 Cal.4th at p. 1129.) As for Suggs's testimony that defendant was looking for Johnson the night before she disappeared, defendant asserts there was nothing in such evidence from which to conclude defendant was searching for Johnson in order to kill her, rather than to have sex with her. We reject defendant's argument for two reasons. First, it ignores the testimony relating to Suggs's initial report to police that defendant said he was "going to kick [Johnson's] fucking ass." Second, we will not reverse a judgment for insufficient evidence simply because the circumstances reasonably might support a contrary finding. (*Ibid.*)

Evidence that Johnson had been bound before her death suggests planning. We note that when police discovered Johnson's body, she was not bound. And as defendant correctly notes, the deputy coroner who conducted a cursory examination of Johnson's body at the scene acknowledged during cross-examination that he did not see definitive ligature marks. However, the officers who discovered Johnson's body did note distinctive ligature marks on her neck and wrists. The officers further testified that Johnson's legs were spread apart but her feet were touching. Likewise, her hands were very close together and were pulled out to one side from underneath the body, as if someone had dumped her in the closet and then pulled off a binding. The jury, as the sole judge of the witnesses' credibility, was entitled to credit the officers' testimony and thus to infer that Johnson had been bound. Further, the pathologist testified that death could have resulted from asphyxiation by ligature or manual strangulation. There is ample evidence to support a finding of deliberation and premeditation.

### iii. *Murder of Maria Apodaca*

Like the other five murder victims, Apodaca was a street prostitute. Defendant points out there was conflicting evidence as to whether he even knew Apodaca. But it is the jury, not the reviewing court, that resolves conflicts in the evidence. (*People v. Guerra, supra,* 37 Cal.4th at p. 1129.) Similarly unavailing is defendant's argument that a witness who stated he had seen Apodaca in defendant's company fabricated his testimony. According to defendant, the witness's trial testimony could not be squared with the account he gave to Detective Pane, which the jury also heard. But as we have explained, "Resolution of . . . inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

Apodaca's body was wrapped in a sheet knotted at both ends. Inside the covering, a rope-like piece of cloth held the body in a fetal position, with

both wrists bound together behind the knees. The binding evidence thus supports the inference that, once having disabled Apodaca, defendant contemplated and planned her death. The inference is further strengthened by evidence that defendant bound the three other first degree murder victims at the wrists.

Areas of dark discoloration around Apodaca's neck indicated she may have been asphyxiated, either by suffocation or ligature. Again, the manner of killing coupled with all the other evidence supports a finding that defendant acted deliberately, rather than spontaneously, when he killed Apodaca.

### iv. *Murder of Sharon Massey*

Sharon Massey supplemented her hospital clinic salary by engaging in prostitution. Defendant again asserts there was no evidence he knew Massey. The record shows otherwise. For instance, defendant's former housemate testified that he once smoked rock cocaine with defendant, Massey, and several others at the 19th Avenue residence.

Massey's body was bound into a fetal position with a severed electrical cord that extended around her back and gathered her thighs, legs, and ankles together. A braided fabric strap secured her wrists behind her back. A stereo speaker connector hung loosely around Massey's neck and shoulders. This extensive binding supports an inference that defendant incapacitated Massey, giving him ample time to consider and plan her death. As before, evidence of the other killings further supports such an inference.

During Massey's autopsy, the pathologist found two socks lodged inside her mouth, one of which was far back in her throat. In the pathologist's view, either one or both of the socks could have suffocated Massey. He also opined that the stereo speaker connector draped around Massey's neck could have been used to strangle her. This manner of death, particularly when combined with all the other evidence, strongly suggests defendant murdered Massey according to a deliberate design. Defendant argues that a killing by asphyxiation is as compatible with an "explosion of violence" as it is with premeditation and deliberation. But defendant again misperceives the standard by which we assess the sufficiency of the evidence. " '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*People v. Guerra, supra,* 37 Cal.4th at p. 1129.)

### 2. *Admission of defendant's postarrest statement*

#### a. *Background*

Defense counsel argued at an in limine hearing that portions of defendant's taped interviews with police should be excluded as more prejudicial than probative under Evidence Code section 352.[12] The prosecutor agreed that some of the material, including the references to prior crimes and prison terms, was inadmissible and offered to edit the tapes for trial. With defense counsel's assent, the court deferred ruling on the admissibility of any specific parts of the taped interviews until the prosecutor had prepared the version he wanted to present at trial.

The prosecution called Detective Pane to testify twice during its case-in-chief. Before the witness was scheduled to take the stand the second time, the prosecutor informed the court that the parties had not yet conferred on the edited version of Pane's postarrest interviews with defendant, which the prosecutor intended to present during Pane's testimony. Defense counsel assured the court he would finish reviewing the three-hour tape and meet with the prosecutor before the next court session. When trial resumed, defense counsel raised no objection to the admission of the tape.

During the first postarrest interview, Detective Pane asked defendant, "How many people have you murdered?" Defendant replied, "None. None. N-O-N-E, sir." Detective Pane then queried, "How many prostitutes have you strangled?" Defendant again answered, "None."

At one point in the second interview, Detective Pane asked defendant if he had ever sodomized anyone. Defendant replied, "No." Pane then informed defendant, "Two girls say you wanted to sodomize [them]." Defendant explained, "I talk shit to a lot of women like that. It's just strictly me talking." Pane again asked defendant whether he had ever strangled anyone. Defendant again denied having done so, but added, "I know you're going to have some girls say I did so." Pane said he suspected that defendant had been lying to him, and asked defendant, "What would you believe if you were in my position?" The following exchange then occurred:

"Pane: Okay, all right. So I can assume then—assume because I have these people saying that—that you lied there, I can assume that.

---

[12] Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"Defendant: Okay, I mean you can assume.

"Pane: I have this here saying so many people did it. That you lied there. Is that right?

"Defendant: Okay. You can assume that too.

"Pane: Yeah, I'm assuming this. *Never strangled girls. And I have the one here, so I can say you lied. Right?*

"Defendant: *Okay.*

"Pane: So here you've lied three times to me. You've been in every one of these houses here. So never killed girls, I would think that that would be a lie."

### b. *Discussion*

Defendant contends that the court erred in admitting the italicized portion of his taped postarrest statement to Detective Pane. According to defendant, the jury would have inferred from the challenged statement defendant's tacit acknowledgment that he had once "strangled a girl" to death. Because evidence of a defendant's propensity to commit murder is highly prejudicial, he argues, its admission violated Evidence Code section 352 and his right to a fundamentally fair trial under federal constitutional principles.

Defendant has forfeited his claim of error because defense counsel failed to object to the admission of the edited version of the taped postarrest statement. (Evid. Code, § 353, subd. (a).) A motion in limine can preserve an appellate claim, so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine the evidentiary question in the proper context. (*People v. Crittenden* (1994) 9 Cal.4th 83, 125–127 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Morris* (1991) 53 Cal.3d 152, 188–191 [279 Cal.Rptr. 720, 807 P.2d 949].) At trial, the defense presented a pretrial motion to exclude defendant's postarrest statements as more prejudicial than probative under Evidence Code section 352, but failed to identify the particular passage in question here or argue its purported prejudicial effects. Furthermore, the court deferred ruling on the in limine motion to allow the prosecutor an opportunity to edit the tape. When defense counsel declined to challenge the edited version before it was played for the jury during the prosecution's case-in-chief, the court had no opportunity to consider, let alone correct, any possible error. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [64 Cal.Rptr.2d 892, 938 P.2d 950].) We conclude, therefore, that defendant has not preserved his claim for appeal.

The challenged statement was properly admitted in any event. Contrary to defendant's assertion, no reasonable juror would have inferred from the exchange between defendant and Detective Pane that defendant tacitly admitted having "strangled a girl to death." Throughout the interrogation, defendant steadfastly denied strangling or killing anyone. As the interview continued, Pane accused defendant of lying to him about various matters. Pane said he could assume defendant was lying because there were "people saying" otherwise. Defendant acknowledged that the detective could make that assumption. Defendant also allowed that Pane could assume defendant lied about "never strangling girls" because someone had reported that he did. But defendant's acknowledgement of the detective's logic was not an admission that he had been lying, or that he once had strangled someone to death. In context, the challenged statement would not have conveyed to the jury prejudicial evidence of defendant's propensity to commit murder, as defendant suggests.

### 3. *Guilt phase instructions*

■ Defendant argues that the wording of certain standard instructions given at trial misled the jury and infringed his rights under various state statutes and constitutional provisions. The following principles guide our evaluation of his claims. "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67–68 [82 Cal.Rptr.3d 373, 190 P.3d 706].) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 192 [97 Cal.Rptr.3d 117, 211 P.3d 617].)

#### a. *Juror notetaking*

Before closing arguments, the court instructed on the subject of notetaking using CALJIC former No. 17.48. The court informed jurors they could use their notes during deliberations but cautioned them as follows. "[N]otes are only an aid to memory and should not take precedence over independent recollection. A juror who did not take notes should rely on his or her independent recollection of the evidence and not be influenced by the fact that other jurors did take notes. Notes are for the note-taker's own personal use in refreshing his or her recollection of the evidence. [¶] Finally, should any discrepancy exist between a juror's recollection of the evidence and his or her notes, he or she may request that the reporter read back the relevant proceedings and the trial transcript must prevail over the notes."

CALJIC No. 17.48 first appeared in 1988 in response to *People v. Whitt* (1984) 36 Cal.3d 724 [205 Cal.Rptr. 810, 685 P.2d 1161] (*Whitt*). (Use Note to CALJIC No. 17.48 (5th ed. 1988).) *Whitt* declared in dictum it was "better practice" for courts to caution jurors on the risks of notetaking. (*Whitt*, at p. 747.) Because a juror's notes can be inaccurate or can involve trivial matters, the instruction directed jurors to give more significance to their independent recollection than to their notes. To prevent notetaking jurors from dominating the deliberations, the instruction cautioned jurors who had refrained from taking notes not to be influenced by the fact another juror did so. (*People v. Thompson* (1988) 45 Cal.3d 86, 119–120 [246 Cal.Rptr. 245, 753 P.2d 37]; *Whitt, supra*, at pp. 746–747.) CALJIC No. 17.48 was later rephrased and incorporated into CALJIC Nos. 0.50 and 1.05 so that it could be given either at the beginning or conclusion of trial, or both. (Use Note to CALJIC No. 0.50 (Spring 2008 ed.); Use Note to CALJIC No. 1.05 (6th ed. 1996).) A pretrial and posttrial version of the cautionary instruction also appears in CALCRIM Nos. 102 and 202, respectively.

Until now, appellate claims based on CALJIC No. 17.48 and its successors have argued the court erred when it failed to instruct, or gave inadequate instruction, on the risks of notetaking. (See, e.g., *People v. Ghent* (1987) 43 Cal.3d 739, 757–758 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People v. Mayfield* (1993) 5 Cal.4th 142, 180 [19 Cal.Rptr.2d 836, 852 P.2d 331]; *People v. Avena* (1996) 13 Cal.4th 394, 423 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Dennis* (1998) 17 Cal.4th 468, 537–538 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Here, however, defendant claims that *giving* the standard instruction infringed his statutory and constitutional rights in several respects.

Defendant first contends the instruction prohibited "note sharing" and impaired the jury's deliberative and factfinding process. The direction that jurors "not be influenced" by another juror's notes and to trust their independent recall, he posits, foreclosed a useful source of relevant information in the jury room and required jurors to accept their own personal recollection as more reliable than the written notes of another juror "no matter what."

■ Defendant correctly observes that section 1137 authorizes jurors to consult their notes during deliberations. (See *People v. Bonillas, supra*, 48 Cal.3d at p. 794.) And he may be correct that section 1137 appears to contemplate the free exchange of notes among jurors. The statute provides, "Upon retiring for deliberation, the jury may take with them . . . notes of the testimony or other proceedings on the trial, taken by themselves or any of them . . . ." (§ 1137.)

Contrary to defendant's argument, however, there is no reasonable likelihood any juror would have understood the challenged instruction to prohibit

"note sharing" or to require steadfast adherence to personal recollection when it conflicted with another juror's notes. The instruction admonished the jurors not to be influenced by the "fact" other jurors took notes. It did not caution jurors against considering their substance. We recognize jurors were told that "notes are for the note-taker's own personal use in refreshing his or her recollection of the evidence." In context, however, that portion of the instruction reemphasized that each juror's notes are an aid to his or her own memory of the evidence presented at trial and no more influential during deliberations than the independent recollection of the other jurors. No reasonable juror would have understood the instruction to prohibit him or her from referring to notes while discussing the evidence.

Furthermore, and more significantly, the jury charge as a whole apprised the jurors of their role in the deliberative process. The court outlined the jury's duty to deliberate when it instructed on notetaking at the outset of trial. The court advised, "And if you should have a conflict in the jury room, for example, during jury deliberations, as to what testimony was on a particular issue, you can use the notes to refresh your memory; but if that conflict is a difficult one to resolve, don't say, well, my notes say this and therefore it's so." Moreover, as defendant acknowledges, the court also instructed with CALJIC No. 17.40, which again conveyed to the jurors, in relevant part, their duty to deliberate: "Each of you must decide the case for yourself, but should do so only after discussing the evidence and the instructions with the other jurors." In light of the instructions as a whole, we conclude CALJIC No. 17.48 did not mislead the jury about the deliberative process.

Defendant also argues that CALJIC No. 17.48 violated section 1138 and fair trial guarantees by restricting the jury's right to rehear testimony. According to defendant, the instruction told jurors they may request a readback of testimony when a juror's recollection of the evidence conflicted "with his or her notes." He asserts that jurors would have understood from this language they should *not* seek a readback to resolve a conflict between two or more jurors.

Section 1138 gives deliberating jurors the right to rehear testimony and instruction on request. (*People v. Frye* (1998) 18 Cal.4th 894, 1007 [77 Cal.Rptr.2d 25, 959 P.2d 183].) It also implicates a defendant's fair trial rights. (*Ibid.*; see also *People v. Hillhouse, supra*, 27 Cal.4th at p. 506.)

In light of the entire jury charge, defendant's assertion is completely unsupported. At the outset of trial, the court assured the jurors that in the event of a "conflict in the jury room" over testimony, "there wouldn't be any problem rereading any testimony to you, should you need that done." The court repeated the point at the conclusion of trial when it advised, "If you

have a serious question as to what the evidence is, you can always request the court reporter to read back any portion of the testimony. As I have told you, we have daily transcripts of all the testimony, so it's not going to be any serious problem for us to read back any testimony that you may need during the course of your deliberations." Given the entire charge, there is no reasonable likelihood any juror would have understood CALJIC No. 17.48 to restrict the readback of testimony in the manner defendant suggests. Further, the availability of readback was made clear. Thus, if there was a conflict caused by varying recollections or annotations, as the court instructed the jury, it should refer to the reporter's transcription that forms the official record of the testimony.

As defendant points out, the standard instruction was revised after his trial. The last sentence now reads, "Finally, should any discrepancy exist between a juror's recollection of the evidence and a juror's notes, *or between one juror's recollection and that of another*, you may request that the reporter read back the relevant testimony which must prevail." (CALJIC No. 1.05, italics added; see also CALJIC No. 0.50.) According to defendant, the addition of the italicized language demonstrates that the version given in his case unduly restricted the jury's right to rehear testimony on request.

■ The revised instructional language identifies a second type of conflict that jurors may wish to resolve by requesting a readback of testimony.[13] But nothing in the instruction, before or after its revision, suggests the jury may request readbacks to resolve only the specified discrepancies. The given instruction was not flawed.[14] (Cf. *People v. Mickey* (1991) 54 Cal.3d 612, 671–672 [286 Cal.Rptr. 801, 818 P.2d 84] [revision to CALJIC No. 2.03 improved the accuracy of the standard instruction but did not render the prior version erroneous].)

### b. *Circumstantial evidence*

The court told the jury that evidence is either direct or circumstantial, both are an acceptable means of proof, and "neither is entitled to any greater weight than the other." (CALJIC No. 2.00.) The court also gave CALJIC Nos. 2.01 and 2.02 on how to consider circumstantial evidence generally and

---

[13] The CALCRIM instructions do not refer to conflicts in recollection. For instance, the readback instruction simply states, "The court reporter is making a record of everything said during the trial. If you decide that it is necessary, you may ask that the court reporter's notes be read to you. You must accept the court reporter's notes as accurate." (CALCRIM No. 104.) The notetaking instruction likewise omits reference to discrepancies "between one juror's recollection and that of another." (CALCRIM No. 102.)

[14] Because we find no merit to defendant's claim of instructional error, we do not address respondent's argument that the People's right to due process precludes reversal for instructional error when no objection was raised below.

circumstantial evidence of a specific mental state, respectively. In relevant parts, these instructions informed the jury that between two reasonable, but opposing, interpretations of such evidence, it must accept the one that is consistent with defendant's innocence and reject the one that points to his guilt.

■ CALJIC Nos. 2.01 and 2.02 are cautionary instructions that the court must give when, as here, the prosecution's case rests wholly or substantially on circumstantial evidence. (*People v. Marquez* (1992) 1 Cal.4th 553, 577 [3 Cal.Rptr.2d 710, 822 P.2d 418]; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 142, p. 202.) The instructions "clarify the application of the general doctrine requiring proof beyond a reasonable doubt to a case in which the defendant's guilt must be inferred from a pattern of incriminating circumstances. [Citations.]" (*People v. Gould* (1960) 54 Cal.2d 621, 629 [7 Cal.Rptr. 273, 354 P.2d 865].)

Defendant claims that the circumstantial evidence instructions undermined the requirement of proof beyond a reasonable doubt as applied to direct evidence, in violation of state law and his constitutional rights to due process and jury trial. According to defendant, because the instructions omitted any reference to direct evidence, jurors would have believed that a fact essential to guilt that was based on direct, rather than circumstantial, evidence need not be proved beyond a reasonable doubt.

Again, his argument finds no support. As noted above, the court instructed that both direct and circumstantial evidence were acceptable means of proof. It also explained that a defendant is presumed innocent until proved to the contrary "and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty." (CALJIC No. 2.90.) These instructions, coupled with the directive to "consider the instructions as a whole and each in light of the others," fully apprised the jury that the reasonable doubt standard applied to both forms of proof. Indeed, defendant benefitted from the elaboration of the reasonable doubt standard in CALJIC Nos. 2.01 and 2.02.

Defendant complains that the circumstantial evidence instructions impermissibly dilute the reasonable doubt standard in other respects, infringing his state and federal constitutional rights to due process and jury trial, and rendering the guilt verdicts unreliable under the Eighth Amendment. We have repeatedly rejected the same arguments in cases where, as here, the jury was instructed on the presumption of innocence, the burden of proof and reasonable doubt. (See generally *People v. Howard* (2008) 42 Cal.4th 1000 [71 Cal.Rptr.3d 264, 175 P.3d 13]; *People v. Rogers, supra,* 39 Cal.4th at pp. 888–889; see also *People v. Brasure* (2008) 42 Cal.4th 1037, 1058 [71

Cal.Rptr.3d 675, 175 P.3d 632] [references to "reasonableness" and "unreasonableness" did not dilute the reasonable doubt standard]; *People v. Crew* (2003) 31 Cal.4th 822, 847–848 [3 Cal.Rptr.3d 733, 74 P.3d 820] [same conclusion as to references to "guilt" and "innocence"].) Defendant posits "it is no answer" to say jurors instructed with CALJIC No. 2.90 would have understood they could not convict except on proof of guilt beyond a reasonable doubt. We have rejected that argument as well. (*People v. Carey* (2007) 41 Cal.4th 109, 130 [59 Cal.Rptr.3d 172, 158 P.3d 743].) Defendant's assertions to the contrary notwithstanding, we see no reason to reconsider our prior decisions.

### c. *Motive*

The court instructed the jury that "presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence." (CALJIC No. 2.51 (5th ed. 1988).) Defendant argues that the terms "establish guilt" and "establish innocence" reduced the prosecution's burden and shifted it to defendant in violation of due process and jury trial guarantees under the state and federal Constitutions. He acknowledges we previously have concluded that the same version of CALJIC No. 2.51 did not shift the burden of proof.[15] (See, e.g., *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302]; *People v. Frye, supra,* 18 Cal.4th at p. 958.) Defendant attempts to distinguish our prior decisions on the ground that the jury in his case received "similarly misleading dichotomies" in the circumstantial evidence instructions. His attempt fails. As previously discussed, the circumstantial evidence instructions are not misleading.

### d. *Willfully false witnesses*

The court instructed the jury it may reject the entire testimony of a witness who willfully testified falsely on a material point unless it "believe[s] the probability of truth favors his testimony in other particulars." (CALJIC No. 2.21.2.) Defendant contends the instruction diluted the reasonable doubt standard and thus infringed his state and federal constitutional rights to due process and jury trial because the instruction allowed jurors to accept the testimony of witnesses, including crucial prosecution witnesses whose testimony was necessary for conviction, on finding a mere "probability of truth." We have repeatedly rejected similar challenges to the instruction that was given in defendant's case, and do so again. (*People v. Nakahara* (2003) 30 Cal.4th 705, 714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Riel* (2000) 22 Cal.4th 1153, 1200 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

---

[15] The instruction later was revised to read, "Absence of motive may tend to show the defendant is not guilty." (CALJIC No. 2.51 (6th ed. 1996).)

### e. *Duty to present evidence*

The court instructed the jury, "Neither side is required to call as witnesses all persons who may have been present at . . . or who may appear to have some knowledge of these events." (CALJIC No. 2.11.) Defendant complains the instruction suggested to jurors he was required to at least call *some* witnesses. By making it appear defendant had an evidentiary burden of some kind, he argues, the instruction in effect reduced the prosecution's burden of proof in violation of his rights to due process and jury trial.

*People v. Daniels* (1991) 52 Cal.3d 815 [277 Cal.Rptr. 122, 802 P.2d 906] rejected an identical claim. Here, as in *Daniels*, the inference defendant claims the jury would draw from the instruction is "quite strained" and was dispelled in any event by the reasonable doubt instructions. (*Id.* at p. 873; see *People v. Ratliff* (1986) 41 Cal.3d 675, 693 [224 Cal.Rptr. 705, 715 P.2d 665].) Defendant argues that his case is different from *Daniels* in that other instructions given at trial diluted the reasonable doubt standard. We have rejected the predicate on which his argument rests.

### 4. *Asserted prosecutorial misconduct*

Defendant contends the prosecutor misstated the law on premeditation and deliberation during guilt phase closing argument in violation of his constitutional rights to due process, fair trial, jury trial, a meaningful opportunity to defend against the charges, and a reliable death verdict.

Defendant failed to preserve this claim for appeal because he failed to object and request an admonition to cure the asserted harm. (*People v. Chatman* (2006) 38 Cal.4th 344, 407 [42 Cal.Rptr.3d 621, 133 P.3d 534].) In any event, we conclude the prosecutor did not misstate the law.

The prosecutor explained the difference between first and second degree murder by addressing the evidence as a whole. He argued, "Assuming these are murders and assuming these people died of some sort of asphyxial death, either someone put a pillow over their face and suffocated them, sock down their mouth, or someone took a ligature and put it around their neck and strangled them to death, you know, *that doesn't occur in a flick of an eye*, moment's time. Even if you have a person all hog tied up, . . . hands tied behind their back, maybe they can struggle, maybe make a few guttural sounds, takes awhile for them to die, doesn't it? Isn't that what first degree murder is all about?"

Alternately, the prosecutor argued, assuming the first murder was not premeditated or deliberated, "What do you think happens . . . next time you

do it? Does it become a first degree murder the third time, the fourth time, the seventh time? Don't you think at some point you draw upon that memory bank when you picture in your mind those bodies squirming, jerking around for whatever period of time they did before they finally stop moving? [¶] . . . [S]omewhere along the line between number one and number seven, got to become first degree murders . . . . Even if you are unpersuaded with the first one, at least, by the second one, *it has got to leave an impression in your mind that you will never forget.*"

 We disagree with defendant that the italicized portions of the prosecutor's argument invited the jury to convict him of first degree murder on erroneous theories. Contrary to defendant's assertion, the prosecutor did not suggest premeditation and deliberation could occur in the "flick of an eye" rather than after "careful thought and weighing of considerations." The prosecutor's colloquial remark that asphyxial death "doesn't occur in a flick of an eye" prefaced his point that premeditation and deliberation could be inferred from the victims' asphyxiation because it "takes awhile for them to die." Viewed in its entirety, the prosecutor's argument was a correct statement of law. (*People v. Bonillas, supra,* 48 Cal.3d at p. 792 ["Ligature strangulation is in its nature a deliberate act."].)

Nor do we discern how the prosecutor's alternative theory of the case conveyed the erroneous notion that premeditation and deliberation could arise after, rather than before, defendant formed the intent to kill. According to defendant, the prosecutor's statement that the first killing left "an impression in [defendant's] mind that [he would] never forget" suggested that premeditation and deliberation could begin while defendant was already engaged in the fatal act of asphyxiating the subsequent victims. We disagree. The thrust of the prosecutor's argument was that even if defendant did not premeditate and deliberate the first killing, premeditation and deliberation could be inferred when he killed again and again in the same manner. This, too, is a correct statement of law. (*People v. Steele, supra,* 27 Cal.4th at p. 1244 [killing repeatedly under similar circumstances creates a reasonable inference the killing was intended and premeditated].) Further, the court properly instructed on premeditation and deliberation, and informed the jury that if the court's instructions conflicted with the arguments of counsel, it must follow the instructions. On this record, there is no reasonable likelihood the jury would have based its first degree murder verdicts on an erroneous theory of premeditation and deliberation. (*People v. Stitely* (2005) 35 Cal.4th 514, 558–559 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Boyette* (2002) 29 Cal.4th 381, 435–436 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

B. *Penalty Phase Issues*

1. *Jury selection*

a. *Excusal of prospective jurors for cause*

Judge Virga declared a mistrial after the first jury deadlocked on penalty. Judge Mering presided over the penalty retrial.

Prospective jurors for the penalty retrial filled out a detailed questionnaire and returned to the courtroom later for individual, sequestered, voir dire. Over defense objection, the court granted five of the prosecution's challenges for cause based on the jurors' views concerning the death penalty. On appeal, defendant claims the court's excusal of Prospective Jurors C.G. and S.C. violated his federal constitutional rights to due process, an impartial jury, and a reliable penalty determination.

Under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*), a trial court may excuse a prospective juror for cause based on his or her views in favor of or against capital punishment only when those views " ' "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.' [Citation.]" (*People v. Martinez* (2009) 47 Cal.4th 399, 425 [97 Cal.Rptr.3d 732, 213 P.3d 77].) Prospective jurors sometimes provide equivocal or conflicting answers to questions about their ability to serve. When this occurs, the trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses. (*Id.* at p. 426.) " ' "[A] trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." [Citation.]' [Citation.]" (*People v. Bramit* (2009) 46 Cal.4th 1221, 1235 [96 Cal.Rptr.3d 574, 210 P.3d 1171].) For this reason, " '[o]n review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding. If there is no inconsistency, the reviewing court will uphold the court's ruling if substantial evidence supports it.' [Citation.]" (*People v. Hawthorne* (2009) 46 Cal.4th 67, 80 [92 Cal.Rptr.3d 330, 205 P.3d 245]; see *People v. Salcido* (2008) 44 Cal.4th 93, 133 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *Witt, supra,* at pp. 425–426, 428.)

In this case, we defer to the court's determination that the prospective jurors in question held views that would substantially impair the performance of their duties, and conclude that the court did not err in excusing them.

### i. *Prospective Juror C.G.*

C.G.'s juror questionnaire conveyed uncertainty on the subject of the death penalty. In response to the question whether there was any reason she would like, or not like, to serve as a juror, C.G. wrote, "I do not know if I believe in capital punishment . . . ." When directly asked about her feelings regarding the death penalty, C.G. indicated she was "not sure. . . . Theoretically I'm against it. In practicality it may be justified." She likewise responded, "I don't know," to the question whether she held such conscientious opinions about the death penalty that she would never vote for a death verdict regardless of the evidence. She added, "I can't really think of myself as voting to take someone's life."

The court inquired about the latter point when C.G. appeared for voir dire three days after filling out her questionnaire. When the court asked, "Are you saying that almost certainly you would not return a verdict of death?" C.G. responded, "I—I—I don't—I don't really think I could. Um—and then my thoughts turn to a crime that's really hideous and in reality, I think, well, the person should be put to death. But then I don't want to do it." Defense counsel asked C.G. if she could consider voting for the death penalty. C.G. paused, then answered the question in abstract terms.[16] When the court then asked C.G. whether, as a practical matter, she really would consider imposing a death sentence, she replied, "I don't know. I don't know."

As voir dire progressed, C.G.'s comments became somewhat less equivocal. For instance, in response to defense counsel's further inquiry, C.G. indicated, "Intellectually, I think I could" listen to both sides and reach a verdict that was not influenced by any preconceived opinion about the death penalty. She also stated, following a pause, that she "probably could vote for a sentence of death." C.G.'s equivocation returned, however, during the prosecutor's questioning. At one point, C.G. expressed the view that the death penalty is an act of violence. When the prosecutor asked C.G. whether she thought she could participate in that kind of act, there was a "long pause." C.G. then replied, "I don't know. I would find it extremely difficult." In a followup question, defense counsel elicited from C.G. that she could conceive of a case in which the death penalty would be appropriate, and could put aside her biases and follow the law.

Over defense objection, the court granted the prosecutor's challenge for cause. As the court observed, "There were long delays in a lot of [C.G.'s] answers and particularly when asked if she actually could return a death penalty, . . . on at least one and probably two occasions, after long hesitation,

---

[16] C.G.'s pauses here and at other points during voir dire were noted by the court reporter.

she said, 'I don't know. I don't know.' " The court found that C.G. was fundamentally opposed to the idea of returning a death verdict and that she harbored "grave doubts" she ever could do so. It found there was only a "very, very remote" situation in which C.G. might consider or return a death penalty, no matter what the evidence. Under these circumstances, the court concluded, C.G. was substantially impaired within the meaning of *Witt*.

Here, the record shows that C.G.'s responses were hesitant and unclear. When asked directly whether she could consider imposing a death sentence, she was unable to say. But after personally questioning and observing C.G., the court determined she was fundamentally opposed to voting for death and found it unlikely she could consider doing so, regardless of the evidence. In light of C.G.'s equivocal responses, and the court's firsthand observations, we defer to the court's determination of C.G.'s state of mind and conclude there was no error in excusing her for cause. (*People v. Hawthorne, supra*, 46 Cal.4th at p. 83; *People v. Riggs* (2008) 44 Cal.4th 248, 284 [79 Cal.Rptr.3d 648, 187 P.3d 363].) "[T]he reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the 'definite impression' that [s]he is biased, despite a failure to express clear views. [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

Defendant asserts that the court applied an incorrect standard when it excused C.G. on the ground she "would find it extremely difficult" to impose the death penalty. He relies on *People v. Stewart* (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*) for support. In *Stewart*, the court excused five prospective jurors solely on the basis of their answers on a written questionnaire. The court largely relied on the jurors' responses to the question whether their views would " 'prevent or *make it very difficult* . . . [¶] . . . [¶] . . . [t]o ever vote to impose the death penalty.' " (*Id.* at pp. 442–443, italics added.) We concluded that the court erred in excusing the prospective jurors on this basis because the questionnaire answers provided insufficient information about the jurors' states of mind. (*Id.* at pp. 446–452.) As *Stewart* explains, "the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would make it very difficult for the juror ever to impose the death penalty is not equivalent to a determination that such beliefs will 'substantially impair the performance of his [or her] duties as a juror' under *Witt, supra*, 469 U.S. 412." (*Stewart, supra*, at p. 447; see also *People v. Avila* (2006) 38 Cal.4th 491, 530 [43 Cal.Rptr.3d 1, 133 P.3d 1076] ["mere *difficulty* in imposing the death penalty does not, per se, prevent or substantially impair the performance of a juror's duties"].) This is so because individuals who firmly oppose the death penalty " 'may nevertheless serve as jurors in capital cases so long as they clearly state that they are willing to temporarily set aside their own beliefs in deference to the rule of

law.' " (*Stewart, supra*, at p. 446, quoting *Lockhart v. McCree* (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758].)

Defendant's reliance on *Stewart* is misplaced. The court's inquiry in this case covered much more than C.G.'s conscientious opinions regarding the death penalty. For instance, the court asked C.G. whether, as a practical matter, she could consider imposing a death sentence. This is a correct formulation of the standard in *Witt*. (*People v. Martinez, supra*, 47 Cal.4th at p. 432.) Furthermore, the court did not base its ruling simply on C.G.'s remark that it would be "extremely difficult" for her to vote for a death sentence. Rather, after observing and assessing C.G.'s responses and demeanor firsthand, the court found that C.G.'s fundamental opposition to the death penalty created only a remote possibility that she might consider or return a death sentence, regardless of the evidence in the case. Its finding necessarily encompassed a determination that C.G. was unable to set aside her personal views and follow the law. In *People v. DePriest* (2007) 42 Cal.4th 1 [63 Cal.Rptr.3d 896, 163 P.3d 896], we deferred to the court's excusal of three jurors who indicated they would have "extreme difficulty" voting for the death penalty even in an appropriate case. (*Id.* at p. 22.) In that case, as here, the court was left with the " 'definite impression' " that the prospective jurors could not impartially apply the law. (*Ibid.*) Contrary to defendant's assertion, the court applied the correct standard in excusing C.G.

Defendant also argues that the court erred in excusing C.G. based on her "long pause" and the response that followed it because these were attributable to trial court error, prosecutorial misconduct, and ineffective assistance of counsel. Defendant asserts, for instance, that new and contradictory information confused C.G. and thus slowed her response time. As defendant observes, C.G. was informed in introductory instructions and in the questionnaire that a juror is never required to vote for death, even if he or she found that aggravation substantially outweighed mitigation. But during voir dire, he points out, the court informed her that if she "intellectually, morally, and otherwise concluded this [was] an appropriate case for the death penalty, then it would be her obligation to bring back the death penalty in that situation." Defendant simply asserts without further support that C.G. required time to digest this new information. Defendant also contends that C.G.'s response after the long pause, in which she indicated it would be "extremely difficult" for her to participate in an "act of violence" by voting for the death penalty, was based on an apparent, and uncorrected, misconception that sentencing defendant to death meant he would die by the electric chair.[17] If C.G. had

---

[17] C.G. wrote in three different sections of her questionnaire that she found the electric chair "cruel" and "inhuman[e]." According to defendant, when C.G. indicated during voir dire that she would have difficulty voting for the death penalty, it was death in the electric chair that she had in mind. He asserts that the prosecutor exploited C.G.'s misconception during the line of

been provided accurate information, he speculates, "there is an excellent chance" that she would have responded as she had during questioning by defense counsel, that she could follow the law and put aside her views about the death penalty.

We have reviewed the record of voir dire and conclude C.G's "long pause" and the response that followed were not the products of confusion and misconception engendered and perpetuated by the court and the attorneys. Contrary to defendant's assertion, C.G. was not given "new and contradictory information" that required time for reflection. There is no conflict between the principles that a juror is not required to find death the appropriate penalty but that, if she does conclude that death is appropriate, she must return a verdict of death. Nor do we agree that C.G.'s response following the long pause was tainted by her misconception that executions were carried out by electric chair. During questioning, the prosecutor noted that C.G. had written in her questionnaire that the electric chair is an inhumane punishment. He then asked her, "[B]eyond the way . . . that the penalty is imposed," is it improper "for the state to take someone else's life?" He also inquired whether C.G. thought the death penalty perpetuates violence. (*Ibid.*) The prosecutor's questions may have been prompted by C.G.'s remark about the electric chair, but they were directed at her views regarding the death penalty generally, not about the manner of its execution.[18] C.G.'s responses to those questions provided a proper basis on which the court could excuse her for cause.

██ We also reject defendant's further argument that the court's reliance on C.G.'s long pauses as a reason to excuse her is contrary to *People v. Heard* (2003) 31 Cal.4th 946 [4 Cal.Rptr.3d 131, 75 P.3d 53]. In *Heard*, we reversed the defendant's death sentence because the court erroneously excused a prospective juror whose statements indicated that he would not automatically vote for life without parole, regardless of the evidence. (*Id.* at pp. 963–966.) In so doing, we rejected the People's argument that the prospective juror's " '[l]ong period of silence' " before answering a question by the court supported excusal. (*Id.* at p. 967, fn. 10.) We explained that reflection was appropriate in light of the court's imprecise questioning, and that the answer that followed did not amount to grounds for excusing the prospective juror for cause. (*Ibid.*) Here, by contrast, C.G. paused numerous times before offering halting, equivocal responses to questions regarding her views on the death penalty. C.G.'s silence was an expression of her uncertainty, not of

questioning that led to the "long pause" and its response, and he faults the court and defense counsel for not informing C.G. that, at the time of trial in defendant's case, the death penalty was carried out by lethal gas, not the electric chair.

[18] The manner in which the death penalty is carried out is irrelevant to the penalty determination. (*People v. Lucas* (1995) 12 Cal.4th 415, 499 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

appropriate reflection. As our cases make clear, a prospective juror's noticeable pauses before answering questions properly informs the court's determination whether to excuse him or her for cause. In *People v. Hawthorne, supra*, 46 Cal.4th 67, we upheld the court's excusal of a prospective juror who took " 'a long time in answering.' " (*Id.* at p. 82.) In *People v. Abilez* (2007) 41 Cal.4th 472 [61 Cal.Rptr.3d 526, 161 P.3d 58], we found no abuse of discretion in the court's for-cause excusal of a prospective juror whose pauses of 20 to 30 seconds before answering led the court to reasonably conclude he was being evasive about his views. (*Id.* at p. 498.) Likewise, in this case, the court properly relied on the manner in which C.G. responded to questions in determining whether her views would substantially impair her obligations as a juror.

██ Deference to trial court findings and the requirement of timely objection are rules grounded in reason and practicality. The trial court and counsel are in a far superior position to evaluate a prospective juror's demeanor and its significance. A speculative argument, made years after the fact, and based solely on a cold record, is merely an exercise in revisionist history.

### ii. *Prospective Juror S.C.*

Prospective Juror S.C. indicated in her questionnaire and during questioning that she supported the death penalty. She also stated she believed there are individuals who should be sentenced to death. However, in response to the question whether there was any reason she would like, or not like, to sit as a juror in the case, she wrote, "It would be hard for me to choose [the] death penalty." During voir dire, when S.C. was asked whether she was capable of making a sentencing decision that could involve imposing the death penalty, she indicated she did not think she was. S.C. explained that she would "hate to be the one who makes the decision" and "the thought of sending someone to death, taking somebody's life would disturb me."

As voir dire continued, S.C.'s responses to questions regarding her reluctance to serve on a capital sentencing jury became equivocal. She answered, "I don't know," when asked whether she could set aside her feelings about deciding punishment. S.C. agreed with defense counsel that most people have similar reservations. She also replied, "I guess if I have to, I would," when asked whether, if chosen to sit on the jury, she would listen to the evidence and instructions, and deliberate with fellow jurors. But in response to the court's question whether she would vote for life in order to avoid the pressure of sentencing someone to death, she responded, "I don't know. I just—I don't know what I would do, to tell you the truth." The court probed further by asking S.C. again if she probably would vote for a life sentence so she would

not have to "face the tough decision of deciding the death penalty and voting for the death penalty." She responded, "Well, I might, I don't know. It's hard for me to say, you know."

Over defense objection, the court granted the prosecutor's motion to excuse S.C. for cause. The court observed that it was "hard to know what's going through her brain." It also noted that S.C. supports the death penalty, "at least academically." But in the court's view, S.C. had refused to commit herself to saying she could return a death verdict in an appropriate case: She "kept equivocating and kept backing off." Acknowledging that it faced a "difficult choice," the court determined that S.C. was "substantially impaired in her ability to consider, as an alternative in this case, the death penalty."

We will not second-guess the court's ruling excusing S.C. for cause. S.C. expressed support for the death penalty, but was unable to state that she could set aside her reluctance to be personally responsible for sentencing someone to death and vote for the death penalty in an appropriate case. After observing S.C.'s responses and demeanor, the court determined that her inability to say she could return a death verdict in an appropriate case rendered her substantially impaired. S.C.'s equivocal answers, combined with the court's firsthand assessment of her responses and demeanor, could give rise to a "definite impression" on the part of the court that S.C.'s views would substantially impair the performance of her duties as a juror. (*People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1007.) In *People v. Bunyard* (2009) 45 Cal.4th 836 [89 Cal.Rptr.3d 264, 200 P.3d 879], we deferred to the court's determination that the juror's reluctance to serve on the jury rendered her substantially impaired. (*Id.* at pp. 845–846.) In *People v. Cunningham* (2001) 25 Cal.4th 926 [108 Cal.Rptr.2d 291, 25 P.3d 519], we concluded the court did not err in excusing a prospective juror who supported the death penalty but could not personally impose it. (*Id.* at p. 981.) Similarly here, we defer to the court's determination of S.C.'s state of mind, and uphold her excusal for cause.

Defendant argues that S.C.'s responses showed only that her feelings would make it difficult for her ever to impose the death penalty, which is an improper basis for her excusal. (*Stewart, supra,* 33 Cal.4th at p. 447.) That characterization misconstrues the record. S.C. was excused because she was unable to say she could return a death verdict in an appropriate case. The court was in the best position to determine the juror's true state of mind because it had observed her demeanor and oral responses firsthand. (*People v. Martinez, supra,* 47 Cal.4th at p. 426.) We reject defendant's depiction of the basis for S.C.'s excusal and his claim of error.

## b. *Limitation of voir dire*

By written motion, defense counsel submitted a questionnaire for prospective penalty retrial jurors to complete before voir dire questioning. Proposed question No. 103 asked prospective jurors to check "yes" or "no" as to whether they automatically would vote for the death penalty if presented with certain facts. The various facts appeared in five separate subparts. Subpart D asked about a case in which the accused "has been convicted of six murders of women plus has been to prison for sexually assaulting women." Subpart E asked, "Would your answers be the same if one or more murders involved sexual assaults on women?"

The court conducted extensive hearings on the proposed questionnaire and spent considerable time discussing question No. 103. Defense counsel argued in essence that providing basic information about the aggravating factors was necessary to determine whether the prospective jurors could be impartial and fair to both sides. The prosecutor did not oppose general questions touching on the issues that would arise during the case in aggravation, including multiple murder and defendant's extensive criminal history. But, he argued, asking jurors questions about all of the aggravators invited them to prejudge the case. He urged the court to exclude such questions from the questionnaire but allow them during individual questioning when appropriate.

The court ultimately rejected questions about defendant's prior sexual assaults or the sexually assaultive nature of the capital crimes. It explained, "There are limits as to how much specificity and prejudgment we're to provide and . . . let's face it, [the] 800-pound gorilla in this case is six murders . . . . [I]f a juror can deal with that . . . that is a juror [who is] able to consider this case . . . ." In the court's view, the jurors' awareness that defendant stood convicted of "six murders of women" was a powerful enough reminder that the case was extraordinary and had enough of an impact to "give us a start."[19]

The court did permit some questions disclosing specific information about the capital crimes, however. For instance, the preface to a series of questions about pretrial publicity indicated that, between 1986 and 1987, seven women,

---

[19] Question No. 103 was renumbered to No. 90 and modified to read as follows.

"Are your feelings about the death penalty such that regardless of how powerful or impressive the evidence offered in mitigation may be, you would be in favor of the death penalty in every case in which the accused:

"A. Has been convicted of murder? Yes ___ No ___

"B. Has been convicted of six murders of women?

"Yes ___ No ___

"Please explain."

some of whom were believed to be prostitutes, were found buried in backyards and in abandoned houses in the Oak Park area of Sacramento, and that defendant had been convicted of murdering six of them. The court also allowed question No. 20, which asked jurors their feelings about viewing coroner's and autopsy photographs "of several dead women." Although the court refused to allow questions based on the sexually violent nature of defendant's prior convictions, it did allow a question asking whether jurors had read, seen, or heard reports that defendant had a prior criminal record or had served time in state prison and, if so, whether they had formed an opinion about his sentence because of them.

The court revisited the issue just before voir dire began. After considering extensive defense argument, the court disallowed oral questioning about defendant's history of violent sexual crimes against women or the manner in which the capital murders occurred. The court reasoned, as it had before, that such questioning would invite a prejudgment of the case that the law does not allow. The court acknowledged that voir dire questioning is not confined to the abstract and that some consideration of the particular case is permitted. But it found that principle to mean that jurors could be questioned about the general nature of the charges and not the details that may aggravate them. The court told the venire in introductory remarks that defendant had been convicted of murdering six women and sexually assaulting two others. Defense counsel was permitted to ask prospective jurors whether the sheer number of convictions would cause them automatically to vote for death.

Defendant contends the court violated his rights to due process and an impartial jury by refusing to allow the defense to question prospective jurors about their ability to keep an open mind on penalty after hearing evidence about defendant's prior violent sexual assaults against women, a prior prison term, and the condition in which the murder victims' bodies were found. There was no error.

A trial court has wide discretion when conducting death-qualification voir dire in accordance with the commands of *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Witt, supra,* 469 U.S. 412. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120 [63 Cal.Rptr.3d 297, 163 P.3d 4].) We thus review the court's limitations on voir dire for abuse of discretion. (*Ibid.*)

■■■ In 1992, when the court issued its rulings, our decisions emphasized that the voir dire inquiry in a capital case "is directed to whether, without knowing the specifics of the case, the juror has an 'open mind' on the penalty determination." (*People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127].) Applying this principle, *People v. Mason* (1991) 52

Cal.3d 909 [277 Cal.Rptr. 166, 802 P.2d 950] held the court properly refused to allow questioning that gave prospective jurors substantial information about the defendant's elderly victims and the manner in which they were killed. (*Id.* at pp. 939–940.) In explaining why such questioning was not proper on voir dire, the *Mason* court observed, "Many persons whose general neutrality toward capital punishment qualifies them to sit as jurors might, if presented with the gruesome details of a multiple-murder case, conclude that they would likely, if not automatically, vote for death." (*Id.* at p. 940.)

After defendant's trial, we qualified the rule articulated in our earlier decisions: "[D]eath-qualification voir dire must avoid two extremes. On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried. On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented." (*People v. Cash* (2002) 28 Cal.4th 703, 721–722 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*).)

Although the court lacked the guidance of our later decisions, it struck the proper balance in death-qualification voir dire nonetheless. Prospective jurors were asked whether certain circumstances of the case would affect their ability to keep an open mind about penalty. To inform their answers to that inquiry, jurors were told that the first jury convicted defendant of murdering six women and sexually assaulting two others. Although the jurors were not informed about the nature of defendant's prior criminal conduct, a questionnaire item regarding pretrial publicity suggested to them that defendant may have committed other crimes. And although jurors were not informed that the murder victims had been bound and asphyxiated, they learned that some of the victims may have been prostitutes and that the bodies were found inside abandoned houses and buried in backyards. They were also asked how they would feel about viewing autopsy photographs of "several dead women." This questioning allowed sufficient inquiry into the jurors' views about particular facts in the case that could affect their ability to deliberate fairly. The court did not abuse its discretion in refusing counsel's request to further probe jurors' attitudes about defendant's having been sent to prison for violent sexual assaults and the condition in which the murder victims' bodies were discovered.

Defendant argues that *Cash, supra,* 28 Cal.4th 703, compels reversal. In *Cash*, the defendant was convicted of one count each of murder in the course of robbery and attempted murder. During the penalty phase, the prosecution presented evidence that the defendant killed his elderly grandparents when he was 17 years old. The jury returned a verdict of death. (*Id.* at pp. 714, 717.)

On appeal, the defendant claimed the court erred by refusing to allow defense counsel to ask prospective jurors whether they would automatically vote for death if the defendant had previously committed another murder. During jury selection, the court had imposed a blanket rule restricting voir dire solely to the facts appearing on the face of the charging document. (*Id.* at p. 719.) We concluded that the court erred in refusing voir dire on the prior murder, and reversed the defendant's death sentence. The restriction on questioning was impermissible for two reasons. First, a trial court cannot absolutely bar mention of any fact or circumstance solely because it is not expressly pleaded in the charging document. (*Id.* at p. 722.) Second, and relevant to the evidence in that particular case, a prior murder was "a general fact or circumstance that . . . could cause some jurors invariably to vote for the death penalty, regardless of the strength of the mitigating circumstances . . . ." (*Id.* at p. 721.)

Contrary to defendant's argument, *Cash* does not compel reversal here.[20] In this case, the court did not categorically bar questions on matters other than those appearing on the face of the charging document. For instance, the portion of the juror questionnaire asking whether pretrial publicity potentially affected the jurors' views on penalty disclosed that seven women, some of whom were believed to be prostitutes, were found buried in backyards and in abandoned houses, and that defendant had been convicted of murdering six of them. Nor did the prohibited lines of questioning involve facts that would cause some jurors invariably to vote for death. In *People v. Zambrano, supra,* 41 Cal.4th 1082, we held the court did not abuse its discretion in prohibiting defense counsel from questioning prospective jurors about evidence that the murder victim's body had been dismembered. (*Id.* at pp. 1122–1123.) Under the circumstances of that case, we found the fact of dismemberment "does not appear so potentially inflammatory as to transform an otherwise death-qualified juror into one who could not deliberate fairly on the issue of penalty." (*Id.* at p. 1123, italics omitted.) Likewise here, given what the prospective jurors knew about the case, we cannot say that evidence of defendant's prior, nonfatal sexual assaults and related prison term, or the fact the murder victims were found partially clad and bound, would cause an otherwise death-qualified juror to automatically vote for death, regardless of the mitigating evidence. The court did not err in prohibiting the proffered line of questioning.[21]

---

[20] Because we conclude that *Cash* does not support reversal in this case, we do not address respondent's argument that the decision should be overruled.

[21] Language in *People v. Roldan* (2005) 35 Cal.4th 646 [27 Cal.Rptr.3d 360, 110 P.3d 289] does not call into question our conclusion in this case. In *Roldan,* as here, we rejected the defendant's argument that *Cash* compelled reversal of his death sentence. In so doing, we observed that the defendant had identified no particularized fact about his case comparable to the prior murders at issue in *Cash*: "There were in this case no prior murders, *no sensational*

### 2. *Photographs showing condition of victims' bodies when discovered*

The court held a pretrial hearing on the admissibility of photographs and videotapes depicting the murder victims when discovered, and showing their various states of decomposition. The defense argued that, under Evidence Code sections 350 and 352, the court must exclude any photographs or videotapes that were irrelevant, unduly gruesome, or cumulative.[22]

At the hearing, the prosecutor sought admission of only those photographs admitted at the guilt trial. For purposes of comparison, he provided the court with the photographs that had been excluded from the guilt phase. The court reviewed both sets of photographs and the videotapes, and ruled on each one individually, excluding some images as unduly gruesome or cumulative and admitting the rest, or portions of the rest, over defense objection.

Defendant contends the admitted photographs lacked probative value, inflamed the jury, and duplicated witness testimony, and that their admission rendered his penalty trial fundamentally unfair in violation of federal constitutional principles. The court did not abuse its discretion in admitting the photographs. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1284 [96 Cal.Rptr.3d 512, 210 P.3d 1119] [defendant's constitutional rights are not implicated by the routine application of state evidentiary law].)

▇▇▇ The court has broad discretion to determine the admissibility of photographs challenged under Evidence Code section 352 as unduly gruesome or inflammatory. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1149.) In a capital case, however, the court's discretion to *exclude* such evidence is more circumscribed at the penalty phase than at the guilt phase. (*People v. Salcido, supra*, 44 Cal.4th at p. 158.) As we noted in *People v. Bonilla* (2007) 41 Cal.4th 313 [60 Cal.Rptr.3d 209, 160 P.3d 84], "the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences . . . ." (*Id.* at p. 353.) "To determine whether there was an abuse of discretion, we address two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 211–212 [79 Cal.Rptr.3d 125, 186 P.3d 496].)

---

*sex crimes*, no child victims . . . ." (*Id.* at p. 694, italics added.) The dictum in *Roldan* suggests that, in an appropriate case, evidence of "sensational sex crimes" might cause an otherwise death-qualified juror to automatically vote for death, regardless of the mitigating facts. As we have explained, however, this is not such a case.

[22] Evidence Code section 350 provides, "No evidence is admissible except relevant evidence."

 The photographs depicting the victims' bound, decomposing bodies were highly relevant to the circumstances of the crimes. (§ 190.3, factor (a), hereafter factor (a).) They disclosed the manner in which the victims died and substantiated that defendant intended and deliberated the murders. (*People v. Loker, supra,* 44 Cal.4th at p. 705; *People v. Wilson* (1992) 3 Cal.4th 926, 937–938 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) They demonstrated the callousness and cruelty of defendant's acts. (*People v. Thompson* (1990) 50 Cal.3d 134, 181–182 [266 Cal.Rptr. 309, 785 P.2d 857].) And they corroborated the pathologists' testimony and assisted the jury's understanding of it. (*People v. Riggs, supra,* 44 Cal.4th at p. 304; *People v. Bonilla, supra,* 41 Cal.4th at p. 354.) Defendant complains that the photographs confuse his criminal conduct with its postoffense effects, which falls outside the scope of factor (a). We disagree. The "circumstances of the crime" include what happened to the victims' bodies as a result of defendant's actions. (*People v. Bonilla, supra,* at p. 354.) The consequences of criminal conduct often extend beyond the immediate result of an isolated act.

 Nor did the court abuse its discretion in determining that the probative value of each photograph outweighed its prejudicial effect. Defendant claims that five of the images were "particularly revolting" and likely to trigger an "unguided emotional response" from jurors that rendered his penalty trial unfair. (*Penry v. Lynaugh* (1989) 492 U.S. 302, 328 [106 L.Ed.2d 256, 109 S.Ct. 2934].) We have reviewed the five 8-by-10-inch color photographs in question and conclude that they are "not of such a nature as to overcome the jury's rationality."[23] (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 212.) The photographs are unpleasant, but any "revulsion they induce is attributable to the acts done, not to the photographs." (*People v. Brasure, supra,* 42 Cal.4th at p. 1054.) The prosecution was entitled to have the penalty jury consider the real-life consequences of defendant's actions. (*People v. Bonilla, supra,* 41 Cal.4th at p. 354.) Defendant complains that the photographs were simply an adjunct to the pathologists' testimony and, therefore, unnecessary. As we have explained, however, "prosecutors . . . are not obliged to prove their case with evidence solely from live witnesses." (*People v. Lewis, supra,* 46 Cal.4th at p. 1282; see *People v. Brasure, supra,* at p. 1054.)

The court conscientiously considered the admissibility of each proffered photograph. Weighing prejudice against probative value, it excluded several

---

[23] Exhibit 23 depicts Yolanda Johnson's upper torso and head; her bloated face is turned to its side. Exhibit 114 shows Maria Apodaca trussed into a fetal position with her wrists bound together under the back of her knees. Her skin and clothing are dirty, and her facial features have "melted" due to decomposition. Exhibits 168-A and 225 show Sheila Jacox's duct-taped mouth and tightly bound, severely decomposed body. Finally, exhibit 298 depicts the dirt-covered, decomposing body of Sharon Massey trussed at the wrists and ankles into a fetal position. A red sock protrudes from her mouth.

images as unnecessary or grotesque. We find no abuse of discretion in the court's decision to admit the others.

### 3. *Challenges to California's death penalty law*

We reject defendant's "routine instructional and constitutional challenges" to California's death penalty statute, and decline his invitation to reconsider our prior decisions. (*People v. Schmeck* (2005) 37 Cal.4th 240, 303 [33 Cal.Rptr.3d 397, 118 P.3d 451]; see *id.* at p. 304.)

California's death penalty statute, including the multiple-murder special circumstance, adequately narrows the class of murderers eligible for the death penalty, as required by the Eighth Amendment. (*People v. Loker, supra,* 44 Cal.4th at p. 755; *People v. Beames* (2007) 40 Cal.4th 907, 933–934 [55 Cal.Rptr.3d 865, 153 P.3d 955]; *People v. Rogers, supra,* 39 Cal.4th at p. 893.)

Allowing the capital sentencing jury to consider evidence of unadjudicated offenses involving force or violence under section 190.3, factor (b) does not infringe a defendant's rights to due process or a reliable penalty determination.[24] (*People v. Harris, supra,* 43 Cal.4th at pp. 1315–1316; *Tuilaepa v. California* (1994) 512 U.S. 967, 976–977 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Nor does the jury's consideration of the circumstances of the crime under factor (a) result in the arbitrary application of the death penalty in violation of federal constitutional principles. (*People v. Bennett* (2009) 45 Cal.4th 577, 630–631 [88 Cal.Rptr.3d 131, 199 P.3d 535]; *Tuilaepa v. California, supra,* at pp. 973, 975–976.)

The due process and reliability guarantees of the Fifth, Eighth, and Fourteenth Amendments do not require the jury to find, either beyond a reasonable doubt or by a preponderance of the evidence, that an aggravating factor (other than a prior crime) exists, that the aggravating factors outweigh the factors in mitigation, or that death is the appropriate penalty. (*People v. Butler* (2009) 46 Cal.4th 847, 873–874 [95 Cal.Rptr.3d 376, 209 P.3d 596]; *People v. Loker, supra,* 44 Cal.4th at p. 755.) Likewise, the federal Constitution does not require the prosecution to bear the burden of persuasion on penalty. (*People v. Bramit, supra,* 46 Cal.4th at p. 1249; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136–1137 [12 Cal.Rptr.3d 592, 88 P.3d 498].) Neither the equal protection clause, nor the United States Supreme Court's recent pronouncements on the

---

[24] Defense counsel did not render ineffective assistance by failing to challenge the admission of evidence of unadjudicated crimes on the constitutional grounds defendant presents here. The Sixth Amendment does not require counsel to raise futile motions. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804–805 [89 Cal.Rptr.3d 225, 200 P.3d 847]; *People v. Frye, supra,* 18 Cal.4th at p. 985.)

Sixth Amendment jury trial right,[25] compel a different conclusion. (*People v. Burney* (2009) 47 Cal.4th 203, 260, 268 [97 Cal.Rptr.3d 348, 212 P.3d 639]; *People v. Hovarter, supra,* 44 Cal.4th at pp. 1029–1030; *People v. Loker, supra,* at p. 755.)

That the jury is not instructed to make explicit, written findings or to unanimously agree on the particular combination of aggravating factors warranting a death verdict does not violate the due process, equal protection, jury trial, or reliability guarantees of the Fifth, Sixth, Eighth, and Fourteenth Amendments or analogous state constitutional provisions. (*People v. Burney, supra,* 47 Cal.4th at pp. 267–268; *People v. Loker, supra,* 44 Cal.4th at p. 755.) The high court's decision in *Ring v. Arizona, supra,* 536 U.S. 584 does not alter our conclusion. (*People v. Burney, supra,* at pp. 259–260.)

California's death penalty statute does not violate the equal protection clause by denying capital defendants various procedural safeguards that apply to sentencing determinations in noncapital trials, such as juror unanimity. (*People v. Martinez, supra,* 47 Cal.4th at p. 456; *People v. Smith* (2005) 35 Cal.4th 334, 374–375 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

Intercase proportionality review for death penalty judgments is not constitutionally required. (*People v. Butler, supra,* 46 Cal.4th at p. 885; *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

The death penalty law is not contrary to international norms of human decency in violation of the Eighth and Fourteenth Amendments. (*People v. Thornton* (2007) 41 Cal.4th 391, 470 [61 Cal.Rptr.3d 461, 161 P.3d 3]; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229] [California does not use capital punishment as " '*regular punishment* for substantial numbers of crimes' "].) Nor does imposition of the death penalty violate international law, such as the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, or the American Declaration of the Rights and Duties of Man. (*People v. Hamilton* (2009) 45 Cal.4th 863, 961 [89 Cal.Rptr.3d 286, 200 P.3d 898].) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" (*People v. Hillhouse, supra,* 27 Cal.4th 469, 511.)

---

[25] *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428].

## III. DISPOSITION

For the foregoing reasons, we affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 15, 2010.