Filed 6/9/14  P. v. Bulahan CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C073125 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F02286) |
| v. | |
| IGNACIO ANDRES BULAHAN, | |
| Defendant and Appellant. | |

Following a jury trial, defendant Ignacio Andres Bulahan was convicted of first degree murder with personal use of a deadly weapon (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1))[1] and sentenced to 26 years to life.  On appeal, he contends there was insufficient evidence of premeditation and the trial court erred by instructing the jury with CALCRIM No. 362.  We affirm.

**BACKGROUND**

*The Killing*

Around 12:42 a.m. on May 19, 2004, police found the dead body of Thyotis Jackson lying face down on the sidewalk of First Avenue in the Oak Park area of

---

[1]  Undesignated statutory references are to the Penal Code.

1

Sacramento, about a block from the Bonfare Market. Jackson was wearing women's jeans, he had a hair tie on his wrist, and a long-haired women's wig was near his foot. Jackson's T-shirt was pulled over his head, exposing his back. He had stab wounds to the chest and a laceration on his neck.

The pathologist determined that the wound to the neck was consistent with an injury inflicted by a razor or scalpel but did not contribute to Jackson's death. Death was caused by the stab wounds to the chest. The stab wounds were also inflicted by a sharp-edged instrument, but unlike the neck wound, they were deeper than they were long. One stab wound, which was potentially fatal, went through the chest wall and struck his right lung. The other stab wound struck Jackson's heart.

Jackson had abrasions on his head, arm, legs, and back. These were not defensive wounds. The abrasions were consistent with rolling around during a physical altercation or with being beaten by another person.

### The Admission

Alfred Reyes, Jr., had known defendant for at least 10 years when he testified. In the past, they did drugs together and would "run the streets." In 2004, he was living in a four-unit building on First Avenue. One unit in the building was occupied by Reyes's friend, Aleah Metzler. The residence was about a block away from the Bonfare Market.

One day in 2004, Reyes met defendant at the Bonfare Market. Defendant appeared to be under the influence of alcohol. Reyes invited defendant to come to his residence, which defendant did later that evening. Defendant, who was holding a can of beer when he entered Reyes's residence, asked Reyes if he wanted something to drink. Reyes declined, as he was a tow truck driver and on duty that evening.

Reyes had a utility knife with a locking razor blade tip on top of the television in his living room. He did not consider this to be a box cutter, as the razor blade in the utility knife swung in and out and the diamond-shaped blade was thicker than a box

2

cutter blade. Defendant asked Reyes if he could have the knife; Reyes refused, telling defendant it would get him in trouble.

At one point during the visit, defendant told Reyes he was going out to get more alcohol. Reyes asked how he would pay for it, and defendant replied he would sell his cell phone. Reyes left for some towing jobs after defendant left to buy alcohol. When Reyes returned, defendant was there and had a lot of blood on him. Defendant was panicked and pacing up and down. He appeared to be less intoxicated than when they first met that day.

Defendant told Reyes he had tried to sell his phone to a "colored guy" who was going to give him a "blow job" for it. He said that he met the man at the Bonfare Market. The man tried to take defendant's cell phone, so defendant started hitting him. Defendant said he continued to hit the man when he was down.

Defendant did not tell Reyes that he thought the man was a woman. He did not say that he lost his temper after finding out that the person he had sex with was a man and not a woman. Nor did he tell Reyes that the man attacked him or pulled a knife on him.

Metzler came to Reyes's residence when defendant was there. Defendant had blood on his pants and possibly his shirt. He was walking back and forth in the hallway and talking with Reyes. Metzler heard defendant say he killed a man by slitting his throat from "ear to ear." Defendant said the man he killed wanted oral sex from him, and he killed the man because of a phone. Defendant also said that he wanted the other man's phone.

While she was at Reyes's residence, Metzler noticed a blue knife on the coffee table or on the top of the television. Defendant said he wanted to get rid of the knife.

Before defendant left, Reyes told him to turn his pants inside out or someone would see the blood and ask questions. Defendant left by the back door. The following day, Reyes noticed his knife was missing.

3

### *The Investigation*

Reyes did not immediately report his suspicions to law enforcement because defendant threatened to harm him if he said anything. Reyes first tried to tell someone in 2007, but he was ignored by the authorities. While incarcerated in 2009, Reyes got to know a correctional officer and spoke to him about the case and then later to detectives.

Metzler first reported her account of the incident to the police in 2010. She delayed reporting out of fear because of where she lived. Metzler told police that she heard defendant say a "gay guy" asked him to do something sexual and he consequently "went off the hook" because he did not like what the man said. She also said this story sounded like something defendant was going to say but the real story involved defendant wanting to steal a cell phone.

A surveillance video from the Bonfare Market showed defendant first appearing on May 18, 2004, at 11:08 p.m. and last appearing on May 19, 2004, at 12:21 a.m. In the last appearance, defendant was seen walking toward a vacant field. Jackson's body was discovered just beyond the field about 20 minutes later.

Defendant's DNA profile was consistent with the DNA profile of sperm found in Jackson's mouth. The possibility of a random match among unrelated individuals ranged from 1 in 230 quintillion to 1 in 2 quintillion.

Defendant was arrested in April 2010. His social visits at jail were recorded. During one visit, defendant told his visitor: ". . . I just need to figure out what they got against me, you feel me?" The visitor said they had DNA, a witness, and the store video, and defendant replied, ". . . I mean if they don't have the act on video then you know what I'm saying?" Later, when defendant was talking to the visitor about the identity of the witness, he said "get up with that nigga who use[d] to drive the tow truck, bro, yep, him and his bitch, them the only ones bro."

4

*The Defense*

Testifying on his own behalf, defendant admitted four prior felony convictions for auto theft offenses and a prior conviction for possession of a controlled substance while possessing a firearm. Defendant consumed a lot of alcohol and some methamphetamine on May 18, 2004. He walked to the Bonfare Market during the late afternoon or early evening and met Reyes, a prior acquaintance, who invited him over to his residence. Defendant went to Reyes's place sometime between 6:00 and 8:00 p.m.

After spending an hour or two with Reyes, defendant left and went back to the store. Defendant wanted more alcohol, so he sold his cell phone for $20 or $25, which he spent on drugs and alcohol. He met a person who he thought was a prostitute, but this was not the person who bought the phone from him. Defendant agreed to give the prostitute drugs in return for oral sex. He thought the prostitute, Jackson, was a woman.

Defendant and Jackson walked through a field to a really dark doorway on First Avenue, where Jackson performed oral sex on him. Defendant used a condom, but it broke and he ejaculated into Jackson's mouth. This upset Jackson, who then told defendant he was in fact "a boy." Defendant became very upset, as he had strong feelings about homosexuality. He then swung at Jackson, who started fighting with defendant. As they fought, Jackson pulled out a four- to five-inch long pocket knife. After hearing the knife fall to the ground, defendant picked it up and swung it twice in anger with a swinging motion. The fight then ended and Jackson ran away, still wearing his wig. Defendant ran in the opposite direction and threw the knife down a drain.

Defendant admitted killing Jackson but said he did not intend to do so. He told Reyes he fought with Jackson but did not say that he killed him. Defendant also told Reyes there was a guy who was going to give him oral sex; he knew the person was a man, and never told Reyes he thought the person was a woman. He also told Reyes he had been robbed and he beat up someone. Defendant was upset with Reyes for "telling on" him, which is why he told someone to get Reyes's "bitch ass" after he was arrested.

5

A psychologist interviewed defendant, reviewed his criminal record, and tested him. Defendant told the psychologist about the incident. Defendant presented as impulsive, reactive, and under controlled. He also showed significant substance abuse problems.

Defendant was presented as heterosexual, without a healthy level of comfort about homosexuality. He was prone to act out or cause problems in his interpersonal relationships, and killing someone was a dramatic means of acting out. Violence between people is more common when they are under the influence of methamphetamine and alcohol. A person prone to acting out and in the middle of a fight might suddenly escalate the fight without considering the consequences.

## DISCUSSION

## I

Defendant contends there is insufficient evidence of premeditation to support his conviction for first degree murder. We disagree.

In considering a challenge based on sufficiency of the evidence, we review the entire record in a light most favorable to the judgment to determine whether the record contains evidence that is reasonable, credible, and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Silva* (2001) 25 Cal.4th 345, 368.) We will not reverse if the circumstances reasonably justify the jury's findings. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (*Perez*).)

Deliberation and premeditation can occur in a brief interval. (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) The test is not time but reflection; thoughts may follow each other with great rapidity and calculated judgment may occur quickly. (*Ibid.*) Generally, there are three categories of evidence, referred to as the *Anderson* factors,[2]

---

[2]  *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).

6

sufficient to support deliberation and premeditation:  (1) planning activity; (2) preexisting motive; and (3) deliberate manner of killing.  (*Solomon, supra*, 49 Cal.4th at pp. 812-813.)  To convict, a jury need not hear evidence in all three categories.  (*People v. Elliot* (2005) 37 Cal.4th 453, 470-471.)  If evidence of all three categories is not present, then " ' "we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." [Citation.]' " (*Ibid.*)  The *Anderson* factors are not exhaustive; the prosecution need not offer evidence of all three types to support a finding of deliberation and premeditation.  *(Perez, supra*, 2 Cal.4th at p. 1125.)

Defendant claims the evidence is more consistent with a verdict of voluntary manslaughter or second degree murder than first degree murder.  As evidence of provocation, defendant relies on his taking alcohol and methamphetamine, and the fact that he believed Jackson was a woman when he was in fact a man who informed him of this after giving him oral sex.  He finds that those circumstances "could reasonably create intense emotion obscuring judgment even in someone who is not homophobic."  According to defendant, there was no evidence of motive, planning activity, or conduct of the killing that would be consistent with premeditation.  He concludes that "[t]he only reasonable inference to be drawn from these facts is that the killing was the product of a combination of alcohol intoxication, methamphetamine intoxication, provocation not amounting to that necessary for voluntary manslaughter, evidence of a struggle, and unconsidered impulse, rather than being the product of a deliberate judgment or plan coolly and steadily carried out according to a preconceived design."

There is evidence of both planning and motive.  According to Reyes's testimony, defendant wanted to buy more alcohol.  When he left Reyes's residence to get the alcohol, defendant needed money to do so and told Reyes he would sell his phone.  The jury could reasonably find that defendant took the knife from Reyes's residence even though Reyes told him he could not take it:  defendant brought up the knife before the

7

trip to get alcohol, Reyes told him not to take it as it would get him in trouble, and the knife was missing the following day. Finally, Metzler heard defendant say he killed a man over a phone and that he wanted this man's phone. From this, the jury could reasonably conclude that defendant wanted to acquire a cell phone when he left to get alcohol, armed himself to better enable him to do so by force, and killed Jackson in order to take his cell phone.

The manner of Jackson's death is further evidence of premeditation. The location of stab wounds and lack of defensive wounds can be evidence of premeditation. (*People v. Pride* (1992) 3 Cal.4th 195, 247.) There were no defensive wounds on Jackson and the location of the three stab wounds supported a finding of premeditated intent to kill. Two of the wounds, through the chest to the lungs and through the chest to the heart, were fatal or potentially fatal and in locations likely to produce this result. While the third wound, the neck laceration, was not medically serious, Metzler heard defendant tell Reyes he killed the man by slitting his throat from ear to ear. In light of the evidence of planning and motive, the jury could reasonably infer that defendant intended for the neck wound to be fatal. Taken together, the lack of defensive wounds and the infliction of three wounds that could be or were intended to be fatal is additional evidence of premeditation.

Whether there is evidence supporting a verdict of voluntary manslaughter or second degree murder is irrelevant. So long as sufficient evidence supports the jury's verdict, we will not consider whether the evidence could support conviction on a lesser offense. Such is the case here. Evidence of planning, motive, and the deliberate manner of killing constitute sufficient evidence of premeditation.

## II

Defendant attacks the constitutionality of CALCRIM No. 362, one of several of the standardized consciousness of guilt instructions. The prosecutor requested the instruction based on defendant telling the psychologist who interviewed him that Jackson

8

had taken off his wig.  The trial court agreed and instructed the jury:  "If the defendant Ignacio Bulahan made a false or misleading statement before this trial relating to the charged crime, knowing that the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime, and you may consider it in determining his guilt.  [¶]  If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.  However, evidence that the defendant made such a statement cannot prove guilt by itself."  Defendant did not object to the instruction.

Since defendant did not object to the instruction, his contention is forfeited unless the instruction affected his substantial rights.  (§ 1259.)  Substantial rights are equated with a miscarriage of justice, which results if it is reasonably probable the defendant would have obtained a more favorable result had the correct instruction been given.  (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426-427.)

Defendant acknowledges the Supreme Court rejected similar challenges to the constitutionality of CALCRIM No. 362's predecessor, CALJIC No. 2.03.  (*People v. Crandell* (1988) 46 Cal.3d 833, 871 (*Crandell*), overruled on another point in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.)  Nevertheless, he contends that slight differences in the phrasing between CALCRIM No. 362 and CALJIC No. 2.03 render the former constitutionally deficient.  We disagree.

CALJIC No. 2.03 allows a jury to consider a defendant's false statement "as a circumstance tending to prove a consciousness of guilt."  According to defendant, even if, as the Supreme Court held, CALJIC No. 2.03's language does not run afoul of the constitutional proscription against directing or compelling a jury to draw an impermissible inference (*Crandell, supra*, 46 Cal.3d at p. 871), CALCRIM No. 362 does.  The vice in the offending phrase in CALCRIM No. 362 is "aware of [his] guilt of the crime."  In defendant's view, it allows the jury to infer consciousness of guilt of the specific crimes charged, including defendant's mental state at the time of the offenses.  We rejected a similar attack on CALCRIM No. 362 in *People v. McGowan* (2008)

160 Cal.App.4th 1099 (*McGowan*): "Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 . . . , none is sufficient to undermine our Supreme Court's approval of the language of these instructions." (*McGowan*, at p. 1104.)

Defendant gives us no reason to reevaluate our findings in *McGowan*. He reads too much into one phrase, ignores the rest of the instruction, and attributes a directive about his mental state that does not exist within the instruction. There is no material difference between the language used in CALCRIM No. 362 and that used in CALJIC No. 2.03. As the Attorney General argues, both phrases refer to a defendant's psychological, not legal, guilt, something a reasonable jury would have understood. Moreover, the instruction expressly directs the jury that if it concludes defendant made the false statement, "it is up to you to decide its meaning and importance." (CALCRIM No. 362.) Evidence is not pinpointed, nor are the jurors directed to draw impermissible inferences. Based on persuasive authority from the Supreme Court, as well as our own, we reject defendant's constitutional challenge to CALCRIM No. 362.

## DISPOSITION

The judgment is affirmed.

    BLEASE    , Acting P. J.


We concur:


    NICHOLSON    , J.


    HOCH    , J.