Filed 9/11/24  P. v. Randolph CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT LEE RANDOLPH, JR.,<br><br>     Defendant and Appellant. | A166813<br><br>(Sonoma County Super. Ct. No. SCR7132221) |

A jury convicted Robert Lee Randolph, Jr. of two counts of first degree murder and one count of attempted murder, and it found true the accompanying special circumstances and sentencing enhancements.  The trial court imposed life sentences for each murder, and 82 years to life for the attempted murder and enhancements.  Randolph, Jr. alleges instructional error on appeal.  We affirm.

**BACKGROUND**

In 2022, the prosecution charged Randolph, Jr. and Maria Lebron with murdering John Mariana (count 1) and Nathan Proto (count 2), and with the premeditated attempted murder of G.G. (count 3).  (Pen. Code, §§ 187, subd. (a), 664; subsequent undesignated statutory references are to this code.)  The prosecution also alleged multiple-murder, felony-murder-robbery, and felony-murder-burglary special circumstances for each killing.  (§ 190.2, subds. (a)(3) & (17).)  With respect to Randolph, Jr., it also alleged sentencing

1

enhancements with each count: he was armed, personally used a firearm, discharged the firearm, and caused great bodily injury discharging the firearm. (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (c), & (d).)

Randolph, Jr. was a marijuana dealer in Philadelphia. He lived with Lebron — with whom he had a daughter — and they regularly travelled to California to send marijuana home to Philadelphia. In California, Mariana introduced Randolph, Jr. to suppliers, and "Pimp" (P) stored Randolph, Jr.'s gun for him. In October 2016, Randolph, Jr. and Lebron arrived in San Francisco. (Subsequent dates refer to 2016 unless otherwise indicated.) They rented a car and, after spending a night in Sacramento, drove to P's house. P gave Randolph, Jr. two pistols, and the couple spent two nights there.

Mariana owed Randolph, Jr. marijuana. On October 15, Randolph, Jr. met Mariana and left "[i]rritated" because Mariana was "giving him the runaround." Later that day, Mariana called Randolph, Jr. and told him a grower had marijuana for him. Randolph, Jr. met Mariana and the grower (Proto) at a cafe while Lebron and G.G. — Mariana's girlfriend — waited in their cars. After, they all drove to Proto's house and went into the garage. After a few minutes, G.G. went outside, and Lebron followed. They smoked marijuana together before Mariana and Randolph, Jr. joined them. Randolph, Jr. put a trash bag of marijuana in his car, and the group went into the garage and shut the door. They relaxed and smoked, and G.G. played blackjack on her phone.

Suddenly, Randolph, Jr. began shooting. Lebron saw him shoot Mariana in the head. Mariana fell, knocking over a paint can. Proto approached Randolph, Jr. with his hands up, asking what was going on. Randolph, Jr. shot him too. G.G. looked up and saw Randolph, Jr. pointing

2

his gun at her. He fired, and her jaw shattered. She fell screaming and tried to hold her jaw on. Randolph, Jr. went to Proto and shot him again. G.G. heard Mariana scream and then an intense ringing in her ears.

Lebron said to Randolph, Jr., "[w]e gotta get out of here." G.G. was shaking. Randolph, Jr. said "that bitch isn't dead" and grabbed a shovel to "finish her off." Lebron answered, she's already dead. He picked G.G. up by the collar, and she "went limp" and "played dead," trying not to breathe. He dropped her, and the couple left. G.G. heard them drive away, but she did not move until she could not hear anything outside. She checked Proto for a pulse but could not find one. She found Mariana breathing, called 911, and flagged down first responders from the driveway. A helicopter flew her to Stanford Hospital. Mariana and Proto died from their injuries.

Meanwhile, Lebron drove the couple to P's house. Once there, they saw the shooting on the television news; P asked Randolph, Jr. if he had "anything to do with that." Randolph, Jr. nodded, and P burned their clothes.

On October 17, the couple shipped the marijuana to Philadelphia and flew home. They resumed their daily lives until they saw Randolph, Jr.'s picture in a newspaper article. They moved in with Lebron's sister, and Randolph, Jr. shaved his head and got a new driver's license. About three weeks later, police searched the sister's home. The couple fled, leaving their daughter and Lebron's 10-year-old child. They settled in Texas after stopping in Georgia and Florida. Ultimately, the police arrested the couple after two years on the run.

Lebron initially lied to police but later cooperated with the prosecution. Among other things, she pled no contest to accessory to murder and accessory to attempted murder counts. (§§ 32, 187, subd. (a), 664.) In exchange for her testimony, she received a 17-year sentence.

3

At trial, Lebron testified she had previously lied to police, that the prosecution initially charged her with murder, and that she was receiving a 17-year sentence for her testimony. Defense counsel argued Lebron was a "prolific liar" who could not be trusted. He told the jury she was a convicted felon who changed her story to avoid a life sentence, and he pointed out the prosecution could reinstate her murder charges if she did not testify.

The trial court gave CALCRIM No. 337, the pattern jury instruction concerning in-custody witnesses. It told the jury that the "fact that a witness is in custody does not by itself make a witness more or less believable. Evaluate the witness's testimony according to the instructions I have given you." The court also gave CALCRIM Nos. 226 and 316, instructing, "[y]ou alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience." The court also told the jury it could consider in determining credibility whether the witness was "promised immunity or leniency in exchange" for testimony, admitted "to being untruthful," or "committed a crime or other misconduct."

The trial court also gave CALCRIM No. 370, the pattern jury instruction on the relevance of motive to guilt. It stated the prosecutor is "not required to prove that the defendant had a motive to commit any of the crimes charged." It went on to say, in "reaching your verdict you may, however, consider whether the defendant had a motive." "Having a motive may be a factor tending to show that the defendant is guilty," and "[n]ot having a motive may be a factor tending to show the defendant is not guilty."

The jury found Randolph, Jr. guilty of attempted murder and two counts of first degree murder, and it also found true the sentencing enhancements and the multiple-murder and felony-murder-burglary

4

allegations.  The trial court sentenced him to life without parole for each murder, seven years to life for the attempted murder, and 75 years to life for discharging a firearm causing great bodily injury, with all terms served consecutively.  It stayed all other enhancements.

## DISCUSSION

Randolph, Jr. first argues that CALCRIM No. 337 — the pattern jury instruction concerning in-custody witnesses — "encroached on" the jury's Sixth Amendment fact-finding function.  Specifically, he contends the instruction prevented the jury from assessing Lebron's motive for testifying and thus her credibility.  We disagree.

We review the correctness of jury instruction de novo, consider the instructions as a whole, and examine whether the instructions fully and fairly instructed the jury on the applicable law.  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' "  (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)  We "must also consider the arguments of counsel in assessing the probable impact of the instruction," and we " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' "  (*People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

There is no reasonable likelihood the jury understood the instruction as precluding it from assessing Lebron's motive to testify.  (*People v. Mackey* (2015) 233 Cal.App.4th 32, 114 [CALCRIM No. 337 did not preclude jury from considering witness's felony convictions or status as an accomplice in determining credibility].)  Here, Lebron told the jury she was exchanging her

5

testimony for a reduced sentence and that she previously had lied to police. The trial court instructed that, in assessing her credibility, the jury could consider the prosecution's promise of leniency. (*People v. Martin*, *supra*, 78 Cal.App.4th at p. 1111 [presuming jurors correlate jury instructions].) The court also told the jury it could consider Lebron's past untruthfulness and criminal history. Moreover, defense counsel focused on her motive for testifying in closing arguments. (*People v. Young*, *supra*, 34 Cal.4th at p. 1202 [considering counsel's arguments when evaluating jury instructions].) Given the other instructions and defense counsel's closing arguments, we cannot conclude it was reasonably likely the jury understood the instruction as precluding it from evaluating Lebron's motive for testifying. (*Ibid.*; *Mackey*, at p. 114.)

Next, Randolph, Jr. argues CALCRIM No. 370 — the pattern jury instruction on motive — "invad[es]" the jury's Sixth Amendment "province." Specifically, he contends the instruction led the jury to believe assessing the "weight and significance" of Randolph, Jr.'s motive was "not completely within" their control. We are unpersuaded.

CALCRIM No. 370 belies Randolph, Jr.'s argument. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 943.) Its second sentence states, in "reaching your verdict you *may* . . . consider whether the defendant had a motive," and the existence or absence of a motive "may be a factor tending to show the defendant is" "guilty" or "not guilty." (Italics added.) Given this language, it is not reasonably likely the jury understood the instruction as constraining it from considering Randolph, Jr.'s motive when determining his guilt. (*People v. Martin*, *supra*, 78 Cal.App.4th at p. 1111; *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1192–1193.) In arguing to the contrary, Randolph, Jr. relies on *People v. Young* (1970) 9 Cal.App.3rd 106, but that

6

case is inapposite.  There, suggesting that motive is a factual issue, the Court of Appeal only noted the trial court did not err by refusing to give a similar instruction.  (*Id.* at p. 110.)  Here, by instructing with CALCRIM No. 370, the court allowed the jury to resolve for itself the relevance, if any, of Randolph, Jr.'s motive.  (*Anderson*, at p. 943.)

Having found no error, we reject Randolph, Jr.'s claim of cumulative prejudice.  (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

## DISPOSITION

The judgment is affirmed.

_____
RODRÍGUEZ, J.

WE CONCUR:


_____
TUCHER, P. J.


_____
PETROU, J.

A166813; *People v. Randolph, Jr.*

8